557 So.2d 748 (1990)
Harlon FREEMAN and Mary Freeman, Plaintiffs-Appellants,
v.
Fred REW, Linda Rew and Casualty Reciprocal Exchange Co., Defendants-Appellees.
No. 21298-CA.
Court of Appeal of Louisiana, Second Circuit.
February 28, 1990.
Rehearing Denied March 29, 1990.
Wilson & Stephens, David Paul Wilson, Shreveport, for plaintiffs-appellants.
Bodenheimer, Jones, Klotz & Simmons, G.M. Bodenheimer, Shreveport, for defendants-appellees.
Before SEXTON, LINDSAY and HIGHTOWER, JJ.
HIGHTOWER, Judge.
In this rear end automobile collision case, Harlon Freeman ("plaintiff") and his wife, Mary, appeal a judgment denying their respective claims for personal injury and loss of consortium against the following motorist, Linda Rew ("defendant"); her husband, Fred Rew; and the Rews' liability insurer, Casualty Reciprocal Exchange Company. For the reasons hereinafter expressed, we affirm.

FACTS
Plaintiff, who is disabled because of a 1979 work related injury, testified that at approximately 6:00 p.m. on a rainy day, November 19, 1986, he was traveling south on Highway 509 in Mansfield, Louisiana. He was driving a 1970 four door Cadillac DeVille, which he described as "one of the heaviest on the road." His wife and adult son were passengers; all the vehicle's lights, including the taillights, were on. *749 About half a block from a planned left-hand turn onto Pegues Street, plaintiff activated his blinker and applied his brakes two or three times, eventually coming to a complete stop. Seconds later, he was struck from the rear by a 1984 Delta 88 Oldsmobile, driven by Mrs. Rew and acknowledged by plaintiff to be a smaller car than his.
The impact, plaintiff recalled, either knocked his car 40 feet or, by precipitating loss of control of it, permitted the vehicle to travel that distance. Plaintiff's neck snapped back, colliding with either the head rest or the seat back, and his head struck the hard hat worn by his son sitting in the back seat. Theorizing that he even may have been rendered unconscious, plaintiff recounted regaining his senses, only to find himself under the steering wheel with his right leg under, and his left leg on, the dash. A headache began instantaneously; blurred vision and neck and shoulder pain soon followed. Plaintiff's wife and son incurred no injuries and sought no medical attention. After his consciousness returned, plaintiff backed his car up and turned down Pegues Street, where he parked.
Concerning damage to his vehicle, plaintiff stated that the right back quarter panel and right back bumper were bent, as well as the car frame. The automobile was not repaired, plaintiff indicating simply, "They totaled it," although submitting no supporting documentation. In contrast to these descriptions of seemingly severe damage, plaintiff acknowledged under cross-examination that the rear light bulbs were not broken.
In addition to the 1979 low back injury, plaintiff, age 48, had experienced five previous automobile accidents, including two "head-on" collisions. He also, at one time, sustained a gunshot wound to the abdomen.
While conceding that an impact transpired, Mrs. Rew recalled the accident differently. She remembered slowing down shortly before the mishap as she was approached other cars. However, she observed no lights, including brake lights, illumined on plaintiff's Cadillac. The car in front turned and, perceiving no reason for plaintiff to then remain stationary, Mrs. Rew believed him to be proceeding straight ahead. With her vehicle's speed being approximately 15 miles per hour, contact occurred with the rear of plaintiff's car, which appeared to continue traveling at the same speed as before impact.
According to defendant, she had plaintiff in view at all times throughout the mishap. Contrary to plaintiff's claim of being thrown under the steering wheel, she testified that he maintained his position in the driver's seat, proceeded to the next intersection in a normal manner, and turned onto Pegues Street. Plaintiff was not required to back his car up before turning.
The damage to the Oldsmobile was minor, requiring $233 to repair. Although first observing no defacement of plaintiff's vehicle, defendant detected a "little warp" upon closer inspection. Mrs. Rew's two children, ages seven years and three months, riding in belted car seats, were completely unaffected by what she described as a "touching type accident." Finally, she recalled plaintiff saying nothing when asked if he was hurt.
Also testifying was Mansfield police officer Curtis Shaw, Jr., who arrived on the scene shortly after the accident occurred. According to his understanding of events, the larger vehicle was struck from the rear while waiting to make a left-hand turn. He stated, however, that both cars sustained "very, very light" damage. In fact, since the damage to each car was deemed insignificant, no estimated amount was noted on the damage scale of the officer's accident report. Basing his opinion on many years of experience as an officer, Shaw characterized the mishap as an extremely minor one.
Upon Shaw's investigatory inquiry as to whether anyone was injured, plaintiff and the other occupants of his car replied in the negative. Subsequent to the accident, the officer twice saw plaintiff, a distant relation, but noticed no changes in his physical condition.
*750 On November 21, 1986, two days after the accident, plaintiff presented himself at the LSU Medical Center emergency room. He complained of shoulder, neck, and left eye pain, as well as visual difficulties with the eye. Plaintiff's records disclose a diagnosis of musculo-skeletal pain with a muscle relaxer and anti-inflammatory medication being prescribed. He was advised to see a doctor at the LSU Eye Clinic.
On referral by his attorney, plaintiff next saw an orthopedist, Dr. Ragan Green, on December 4. In his deposition, Dr. Green recalled plaintiff describing headaches, neck pain and left arm pain. Also expressed were complaints of decreased sight in the left eye and diminished feeling upon looking all the way to either the left or right side. Cervical examination disclosed tenderness to palpation and a decreased range of motion. Physical therapy and a collar were prescribed; the muscle relaxer and inflammation medication were changed. Dr. Green subsequently saw plaintiff, on December 4 and 12, with continued expressions of discomfort. He was told to persist in his therapy.
Based on purely subjective symptoms, Dr. Green diagnosed the problem as cervical strain. Severity was termed as mild to moderate. According to the physician, he was unable to state that plaintiff received no injury in the accident, and only could say that he had no "objective signs of injury."
About a month after the accident, plaintiff consulted Dr. Ray Michael Freeman, an opthalmologist, concerning visual difficulties with his left eye. Although informed of the details of the accident, the doctor detected no inflammation or other sign of trauma in the eye. Prior cataract surgery to that eye in February 1986 had resulted in the implantation of an intraocular lens, a device supported by a natural membrane which was purposefully not removed. Dr. Freeman's postaccident examination disclosed opacification of the tissue, a condition in which the membrane becomes clouded and vision at times is slightly impaired. The problem was ultimately corrected by laser surgery in July 1988. In addition, another cataract in plaintiff's right eye, first detected about six months before the accident, had further developed, and its progression eventually required surgery.
According to Dr. Freeman, 30 to 50 percent of white cataract patients naturally develop opacification when the involved membrane is not removed during surgery. Also, cataracts of the type excised from plaintiff's left eye characteristically develop in a patient's other healthy eye within about a year of the discovery of the first cataract. All these factors considered, it could not be determined whether plaintiff's opacification in one eye, or the progression of the cataract in the other, resulted from trauma.
Dr. Freeman further explained that, in most instances, the clouding of the membrane, if it is to occur, transpires within two to six months after cataract surgery. In plaintiff's case, the problem arose subsequent to such a period and was initially noticed soon after the accident. Thus, despite an inability to state his opinion in terms of medical certainty, Dr. Freeman averred that, more likely than not, trauma caused or aggravated the opacification.
The physician from whom plaintiff primarily received treatment was Dr. Christopher Burda, a rheumatologist, whom he first visited on March 3, 1987. At that time, plaintiff related the details of his accident and how, after responding to physical therapy and medication, he "popped his neck" when he looked up in the sky one day. Subsequently, he had experienced recurring headaches, left shoulder pain, and left arm weakness, as well as swelling in the left shoulder area and numbness in the left thigh. Dr. Burda's examination disclosed a total of five tender points in the skull, mid-neck area, mid-trapezius area, and elbow. Also, a pinprick to the thigh provoked diminished sensation. However, neck X-rays were negative.
Based on both the accident history related by plaintiff and his own findings, Dr. Burda decided upon the diagnosis of traumatic fibromyalgia, a condition he portrayed as a well recognized chronic rheumatological disease. That malady, the doctor *751 stated, is characterized by pain and aching over a three to four month period, along with a certain number of tender spots, usually three to seven, which are discovered by application of pressure to certain specified sites of the body. Also, 60 to 70 percent of those who suffer from fibromyalgia experience unexplained numbness. In addition, the diagnosis is proper only when another basis for a patient's discomfort cannot be ascertained.
For over a year and a half following his initial visit, plaintiff saw Dr. Burda approximately 18 other times. Treatment consisted of anti-inflammatory medication, along with stretching exercises and electro-stimulation. At trial, the doctor opined that plaintiff's condition remained essentially unchanged and a five to ten percent permanent disability had been sustained, requiring continued treatment and therapy. When asked more precisely about the disability, Dr. Burda interestingly was unable to explain his connection of plaintiff's present purported difficulties to the 1986 accident, rather than to the numerous earlier automobile collisions in which he had been involved.
On December 22, 1987, Dr. William Wade Fox, an orthopedic surgeon, conducted an examination at defendant's request. On that occasion, plaintiff's chief complaints were headaches, left neck discomfort, and low back pain. After reporting being thrown some 40 feet by the rear end collision, plaintiff also told of sustaining a gunshot wound to the kidney and liver in 1973, as well as suffering a 1985 heart attack and having undergone the cataract surgery. During a series of tests, Dr. Fox discovered one tender spot in plaintiff's left occiput and osteoarthritis in the lumbar spine, the latter condition being acknowledged by all parties to have predated the accident. Disputing even the existence of fibromyalgia, Dr. Fox observed that the one tender point was nevertheless insufficient to support such a diagnosis. In his opinion, plaintiff enjoyed the same condition as prior to the accident.

DISCUSSION
A court of appeal may not set aside a trial court's finding of fact in the absence of manifest error or unless it is clearly wrong. Where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed, even though the appellate court may feel that its own evaluations and inferences are as reasonable as those of the lower court. When findings of fact are based on determinations regarding the credibility of witnesses, the manifest error-clearly wrong standard demands great deference to the trier of fact's findings. Only the factfinder can be aware of the variations in demeanor and tone of voice that bear so heavily on the listener's understanding and belief in that which is said. Rosell v. ESCO, 549 So.2d 840 (La. 1989). Of course, the manifest error standard of appellate review applies even when the evidence before the trier of fact consists solely of written reports, records and depositions. Virgil v. American Guarantee and Liability Insurance Co., 507 So.2d 825 (La. 1987).
The observations and opinions of the treating physician are to be accorded greater weight than those of a physician who has not served in that capacity. Colville v. Equitable Life Assurance Society of the United States, 514 So.2d 678 (La. App. 2d Cir.1987). However, the treating physician's testimony is not irrebuttable, as the trier of fact is required to weigh the testimony of all the medical witnesses. S.J. v. S.M., 505 So.2d 897 (La.App. 2d Cir.1987), writ denied, 507 So.2d 229 (La. 1987). In addition, the weight afforded a treating physician's testimony is largely dependent upon the physician's qualifications and the facts upon which his opinion is based. Wells v. Allstate Insurance Co., 510 So.2d 763 (La.App. 1st Cir.1987), writ denied, 514 So.2d 463 (La.1987).
In a written opinion, the district court, noting the minimal contact between the vehicles, found that plaintiff had exaggerated both the facts of the accident and his injuries. Any physical problems, the court concluded, were not related to the *752 vehicular accident at hand. Significantly, the court discredited plaintiff's testimony because of the accounts given by Officer Shaw and defendant, and a history of convictions for burglary, robbery, and DWI.
Based on our review of the record, the trial court was not clearly wrong in its rejection of plaintiff's version of the accident. Defendant's account of the impact, which the court accepted, establishes minor contact between the cars, an assessment shared by Officer Shaw. According to Mrs. Rew, plaintiff was not, as he claimed, jostled about, struck in the head, thrown under the dash, and his car propelled some 40 feet. Rather, he continued to uneventfully handle his vehicle until turning onto another street and stopping. The force of the impact, as reflected in the repair expense incurred by defendant, was extremely minor. Finally, moments after the mishap, plaintiff responded negatively to the officer's question concerning any injuries.
While placing no credence in plaintiff's testimony concerning the circumstances of the accident, the trial court apparently was similarly unimpressed with the medical evidence offered in support of the demands. That determination likewise reveals no clear error and, instead, is supported by the record.
Plaintiff's primary treating physician, Dr. Burda, did causally connect his diagnosis of fibromyalgia to the accident at issue. However, under cross-examination concerning his qualification as an expert, Dr. Burda conceded that, in most cases in which he has testified, he has found his patients to suffer from fibromyalgia. More specifically, he could recall only two or three litigation cases in which he did not arrive at such a diagnosis. Furthermore, Dr. Burda acknowledged that only approximately one percent of his fibromyalgia patients returned for treatment after his testimony. While the trial judge eventually accepted Dr. Burda as an expert, it was clearly stated that the facts elicited during cross-examination would assist in determining the weight to be accorded the doctor's testimony.
In addition, Dr. Burda related that plaintiff, in the first office visit, described accident details that were consistent with his diagnosis. However, the trial court's adverse determination of plaintiff's credibility erodes the reliability of the history given to Dr. Burda.
Also, Dr. Green conceded that the history which he recited was based on statements provided by plaintiff. As with other doctors, plaintiff related only subjective symptoms to Dr. Green. Not only are the histories reported to the doctors questionable due to plaintiff's lack of veracity, but also his purely subjective complaints are similarly suspect.
Of course, Dr. Freeman acquired his knowledge of the accident from plaintiff. Equally significant, though, was Dr. Freeman's testimony that he found no specific sign of trauma in or around plaintiff's eyes and that plaintiff's cataract and membrane opacification problems were, from a medical standpoint, explainable on other grounds.

CONCLUSION
For the foregoing reasons, the trial court committed no manifest error in its credibility and factual determinations rejecting the demands of both plaintiffs. Hence, the judgment appealed is affirmed. All costs are to be borne by appellants.
AFFIRMED.

ON APPLICATION FOR REHEARING
Before SEXTON, LINDSAY, HIGHTOWER, HALL and NORRIS, JJ.
Rehearing denied.