604 So.2d 130 (1992)
Linda BRITTON, Plaintiff-Appellee,
v.
MORTON THIOKOL, INC., et al., Defendants-Appellants.
No. 23725-CA.
Court of Appeal of Louisiana, Second Circuit.
June 24, 1992.
*131 Blanchard, Walker, O'Quin & Roberts by Robert A. Dunkelman, Shreveport, for appellants.
Campbell, Campbell & Johnson by Cecil P. Campbell, Minden, for appellee.
Before SEXTON, HIGHTOWER and STEWART, JJ.
HIGHTOWER, Judge.
In this worker's compensation suit, an employer and its insurance carrier appeal a hearing officer's award of supplemental earnings benefits, medical expenses, and penalties. Although it is undisputed that the claimant originally sustained a job-related lower back injury on November 30, 1988, the primary dispute before us concerns whether any disability continued past August 17, 1989. For the reasons hereinafter expressed, we reverse.

FACTS
On November 30, 1988, while employed by Morton Thiokol, Inc. at an ammunition plant, Linda Britton lifted a heavy shell casing and injured her lower back. She testified that pain in that area immediately shot down her right leg. After reporting the mishap to her supervisor, a co-worker took her to Bossier Medical Center for emergency care.
Shortly thereafter, the employer and its insurer began paying Ms. Britton temporary total disability benefits of $224.80 per *132 week, based on her previous salary of $300. Since that time, claiming continuing debilitating pain, she has not worked regularly at any occupation, but, instead, has sought medical attention from a host of doctors in various specialties.
Following the initial emergency room visit, an orthopedic surgeon, Dr. Clinton McAlister, ministered to Ms. Britton's afflictions with conservative care. After approximately one week, he released her to light duty work on December 5, 1988. When she returned to the plant, the employer required no lifting, merely paperwork and sanding shells. However, claiming that she could only perform such tasks for a short period, she again visited Dr. McAlister on December 12. At that time, she reported the pain to be mostly in her right leg and that the soreness had somewhat improved. The doctor suggested a continuation of limited duty work.
Subsequently, Dr. McAlister received the results of a CT scan, revealing a slight lumbosacral disc bulge but no herniation. At the next scheduled office visit, on December 21, he prescribed bed rest; however, the following week, puzzled by her failure to improve, the doctor admitted Ms. Britton to the hospital for additional testing and conservative care.
Diagnostic procedures during a sevenday stay at the Bossier Medical Center failed to disclose any significant objective findings. Nerve conduction studies of the lower extremities produced normal results, despite evidence of some hyperirritability of the posterior division of the L-5 root on the right. During the hospitalization and upon Dr. McAlister's referral, a neurosurgeon, Dr. Warren Long, evaluated and began treating the patient. Range of motion and straight leg raising tests caused Dr. Long to suspect disc involvement at the L5-S1 level. However, after a completely normal myelogram failed to substantiate that initial impression, he did not deem surgical intervention appropriate.
Subsequent to her hospital discharge on January 2, 1989, Ms. Britton continued to seek attention from both Drs. McAlister and Long, yet neither physician could objectively corroborate her reports of pain. On January 24, Dr. McAlister noted his concern that the patient did not appear to be progressing. In complaints to Dr. Long on January 31, 1989, she indicated that the majority of her pain had switched from the right leg to the left lower extremity.
In early February, after again returning to limited duty, Ms. Britton stated her pain increased. During the next few months, essentially through May, she frequented both doctors with complaints that varied the position and severity of her pain. To Dr. Long, in late February, she reported that the leg pain had switched back to the right side. Attempts to substantiate the problem led to the performance of a multiplane CT scan on February 23, revealing no evidence of disc herniation or nerve pressure.
Ms. Britton again attempted to work on April 17, but reported to the orthopedist that she lasted only half a day. During her final visit to his office on April 25, perceiving an inability to further assist his patient's static condition, Dr. McAllister suggested that she return to Dr. Long to discuss the possibility of surgery.
On May 11, 1989, after once more reviewing the medical records and performing another clinical examination, Dr. Long still failed to substantiate any cause for the subjective complaints. Recognizing that the lack of positive findings militated against surgical intervention, the neurosurgeon finally referred his patient to Dr. Phillip Osborne at the Willis-Knighton Pain Clinic, where physicians and psychologists use a multidisciplinary approach to evaluate reports of chronic pain.
During the course of evaluations at the pain clinic, Dr. Donald R. Smith provided a second neurological opinion on June 2, 1989. An MRI scan and myelogram of the lower back again proved normal except for prominent epidural veins, which Dr. Smith did not consider significant.
In further efforts to determine the validity of Ms. Britton's subjective complaints and to validate any disability, Dr. Donald E. Wolfe, an orthopedic surgeon, conducted a series of tests designed to calculate loss *133 of range of motion and strength deficit. However, when presented with the same procedure more than once, the patient gave responses so inconsistent and inappropriate that she totally invalidated the testing. For example, when asked to perform the "two hand pull test," she could only generate eleven pounds of force using both hands. However, upon exiting the room, she successfully pulled open, with one hand, a door weighing more than eleven pounds. Concluding that the patient did not suffer as debilitating an injury as she would have her physicians believe, Dr. Wolfe recommended that she return to her normal occupation after a short work-hardening (adjustment) program.
As part of this same multidiscipline study, Thomas E. Staats, Ph.D., conducted psychological testing of Ms. Britton. His evaluation revealed a personality profile common among persons experiencing a chronic pain syndrome and seeking compensation. These results suggested an unconscious inclination "to use physical symptoms to secure some form of secondary gain ...," and, according to Dr. Staats, disclosed the possibility that the pain did not physically exist.
Beginning in July 1989, Dr. Osborne, a specialist in occupational medicine and the study of pain, saw the patient approximately ten times. Additionally, he reviewed the reports of the other experts in seeking to assign a disability rating, if possible, based upon AMA guidelines. In his testimony, he explained that the normal myelogram and MRI demonstrated that the patient probably did not have any physiological or structual abnormality in the spine. Next, he stated, consideration would normally turn to loss of range of motion, loss of strength, or any neurological deficit. Marked inconsistency in the patient's responses, however, invalidated the motion and strength test results. Of course, neither of the neurologists, Drs. Long and Smith, found any deficiency.
Finally, Dr. Osborne noted that the patient's psychological difficulties, as established by testing, predated the accident in question. Thus, the pain specialist concluded that he could not utilize any of the factors recommended by the AMA for determining impairment. "Basically," he stated, "what I had in this patient is no xray finding, invalid range of motion, invalid strength, and no neurological findings, and simply a complaint of pain." To double check, Dr. Osborne asked Ms. Britton to perform certain other exercises in which electronic screening would detect any minute muscle spasm previously overlooked. Such efforts disclosed none, however.
Dr. Osborne testified that, based on his multifaceted review, he could not discern that Ms. Britton suffered any residual disability. In view of the psychological results, he concludedand Dr. Long agreedthat the patient needed to be under psychiatric care, but not due to any jobrelated problem. Furthermore, as expressed in Dr. Osborne's evaluation, dated August 19, 1989, Ms. Britton had reached maximum medical recovery.
Based upon reports of the various doctors indicating Ms. Britton could return to work, defendants terminated temporary total disability benefits in August 1989. Subsequently, the employer and insurer received no further correspondence, or requests for medical services, from plaintiff until served with a Disputed Claim for Compensation form, filed with the Office of Worker's Compensation on March 1, 1990.
Ms. Britton did not seek additional medical attention until she saw Dr. Robert D. Foster and Dr. John Knight, both orthopedists, at the LSU Medical Center in October 1989. Examinations by Dr. Foster on the fifth and sixteenth of that month, again produced normal results. Early arthritis and some disc bulging at L5-S1 led to an impression of radiculopathy and chronic back pain, which the doctor felt could benefit from a series of epidural steroid injections. Although concurring in the proposed conservative treatment, Dr. Knight conducted an examination on October 16. At that time, noting that "her CT scans and MRI from Willis-Knighton are really unimpressive as far as her S1 radicular symptoms," he concluded that the patient could return to work.
*134 On January 15, 1990, before Dr. Merwin Moore, another orthopedic surgeon at LSUMC, Ms. Britton asserted the ineffectiveness of the steroid injections and, also, that she continued to experience low back and right leg pains. Again, however, clinical examination disclosed no objective findings. Instead, when checking for sensory loss in the calves, Dr. Moore obtained inconsistent results and observed that "one minute she cannot feel pin prick and the next minute she can."
Almost six months later, on June 11, 1990, Ms. Britton sought chiropractic intervention. On that date she began seeing Scott Aaron, D.C., and, within about five months, had received forty-eight spinal manipulations. X-rays by Dr. Aaron revealed no disc lesions or abnormalities in the low back, but showed the spine "leaning heavily to one side." [Earlier, on October 8, 1989, x-rays taken at LSUMC exhibited a normal lumbar lordotic curve.] Although unaided by any of the previous psychological evaluations or diagnostic results, the chiropractor felt that any return to work by the patient would risk worsening her back condition.
Less than four months before trial, plaintiff sought still another evaluation, this time from Dr. James Albright, likewise an orthopedist at LSUMC. In a visit on August 3, 1990, he decided that the patient would possibly require surgery, although he acknowledged that the exact problem had not yet been diagnosed. Relying largely upon subjective examination results, and apparently without reports from any of the treating physicians, he opined that an L5 nerve root irritation of uncertain origin produced the indicated pain. While making reference to a musculoligamentous sprain or strain to the lower back, Dr. Albright conceded that such injuries usually resolve within three weeks to three months. Refusing to utilize the AMA impairment-rating guidelines, which he considered too inaccurate, the orthopedist stated of the present claimant that, "Well, in my mind, she's ... a hundred percent impaired."
At trial on November 28, 1990, the parties presented testimony from only the claimant and a radiologist, followed by introduction of the various medical reports, depositions, clinic notes, and letters. The hearing officer, after taking the matter under advisement until June 6, 1991, returned a judgment in favor of plaintiff. More specifically, that determination held that defendants 1) owed the claimant supplemental earnings benefits beginning August 17, 1989, based on her ability to return to light duty work and earn a minimum wage; 2) must pay a 12 percent penalty on any past due amount; and 3) must resume payments for all reasonable, necessary and related medical expenses, including the bills previously incurred with Dr. Aaron and at the LSU Medical Center. This appeal ensued.

DISCUSSION

Disability
In worker's compensation proceedings, a claimant bears the burden of demonstrating by a preponderance of the evidence that an employment accident resulted in disability. Walton v. Normandy Village Homes Association, Inc., 475 So.2d 320 (La.1985); Lubom v. L.J. Earnest, Inc., 579 So.2d 1174 (La.App.2d Cir.1991); Gonzales v. Babco Farm, Inc., 535 So.2d 822 (La.App.2d Cir.1988), writ denied, 536 So.2d 1200 (La.1988). For an award of supplemental earnings benefits, the claimant must preponderately prove an inability to earn 90 percent of pre-injury wages. LSA-R.S. 23:1221(3); Lubom, supra.
It is well established that a trial court's finding of fact may not be set aside on appeal in the absence of manifest error or clear wrongness, and where there is conflict in the testimony, reasonable inferences of fact should not be disturbed on review. Arceneaux v. Domingue, 365 So.2d 1330 (La.1979); Canter v. Koehring Co., 283 So.2d 716 (La.1973); Kennedy v. Bearden, 471 So.2d 871 (La.App.2d Cir. 1985); Brents v. Gulf Ins. Co., 465 So.2d 860 (La.App.2d Cir.1985), writ denied, 469 So.2d 984 (La.1985). When a trial court's findings are reasonable in light of the entire *135 record, an appellate court may not reverse a choice between two permissible views of the evidence. Rosell v. ESCO, 549 So.2d 840 (La.1989). Although LSA-R.S. 23:1310.5, in providing for appeal of hearing officer cases to the courts of appeal, fails to set forth the yardstick of review, we ascertain no reason that standard should not be identical to that applied to district court decisions.
The observations and opinions of the treating physician, although not irrebuttable, are to be accorded greater weight than those of a physician who has not served in that capacity. Freeman v. Rew, 557 So.2d 748 (La.App.2d Cir.1990), writ denied, 563 So.2d 1154 (La.1990); Colville v. Equitable Life Assurance Society of the United States, 514 So.2d 678 (La.App.2d Cir.1987). Importantly, the weight afforded an expert's testimony is largely dependant upon his qualifications and the facts upon which his opinion is based. Freeman, supra; Wells v. Allstate Ins. Co., 510 So.2d 763 (La.App. 1st Cir.1987), writ denied, 514 So.2d 463 (La.1987).
In the instant case, Morton Thiokol and its insurer did not contest the occurrence of an injury, but, instead, paid temporary total disability benefits and medical expenses for almost ten months. Nevertheless, they do challenge Ms. Britton's assertions of continuing disability. It is their position that the claimant did not suffer any residual injury after the termination of benefits in August 1989. Upon review of the record, we agree.
None of the numerous physicians who initially treated and evaluated plaintiff, over a period of 18 months, could find any objective signs to substantiate her pain. In fact, after repeated and comprehensive examinations, these doctors concluded that any back pain stemmed from psychological and not physical problems, and that plaintiff's emotional problems did not relate to any employment injury.
Furthermore, plaintiff's reports of pain and inability to function came into serious question by her own doctors. By giving inconsistent and inappropriate responses to tests designed to measure any deficit in strength and range of motion, and thus invalidating such studies, plaintiff cast significant doubt upon the veracity of her entire symptomatology.
Clearly, the hearing officer's determination that plaintiff's abilities extend only to limited duty work is not founded in the medical evidence. Contrary to the ultimate judgment rendered, Drs. Long, Wolfe, Osborne, and Knight all concluded that claimant possessed the ability to return to her normal employment. Even the testimony of Dr. Albright, plaintiff's only medical expert, does not support the determination that Ms. Britton should return to light duty. Instead, Dr. Albright emphatically stated his belief in the patient's complete disability. Thus, all of the physicians concluded either that Ms. Britton could fully resume her original occupation or, conversely, that she is physically disabled for work.
In eventually rejecting a determination of complete disability, the hearing officer likely recognized that Dr. Albright only examined the patient on a single occasion, that during his evaluation he obtained further negative test results, and that he apparently did not have the benefit of previous reports concerning plaintiff's condition and prolonged treatment. Seemingly, the hearing officer afforded Dr. Albright's testimony very minimal, if any, weight.
Only the chiropractor made reference, and that occurring quite obliquely, to the possibility of plaintiff returning to limited duties. However, his assessment of claimant's condition rests entirely upon his discovery of an abnormal spine curvature, a diagnosis contradicted by the testimony of all of the medical experts, and a multitude of other x-rays, MRI's, myelograms, and CT scans. Dr. Aaron furthermore expressly stated that he does not evaluate impairment and disability in patients, and has received no special training in that field.
In summary, then, the conclusion of the hearing officer, at best, rests primarily upon the statements of the chiropractor, Dr. Aaron, whose diagnosis is directly contradicted by other objective evidence, and totally inconsistent and implausible when *136 compared with all of the medical testimony. Hence, the record discloses no reasonable basis for the rejection of the preponderate medical evidence and for a decision that, instead, returns plaintiff to light duty work. Consequently, determining that the hearing officer's finding is clearly wrong in that respect, we reverse the award of weekly benefits. In light of that conclusion, of course, LSA-R.S. 23:1201 penalties are also inapplicable.

Medical Expenses
LSA-R.S. 23:1203(A) sets forth the duty an employer owes the employee, regarding medical expenses in a worker's compensation case:
[T]he employer shall furnish all necessary drugs, supplies, hospital care and services, medical and surgical treatment, and any nonmedical treatment recognized by the laws of this state as legal....
(Emphasis added.) Since there is ample medical evidence to show the plaintiff is no longer disabled and can return to normal employment, the medical bills incurred after August 1989 are not reimbursable. See Price v. Fireman's Fund Ins. Co., 502 So.2d 1078 (La.1987), and compare City of Baton Rouge v. Noble, 535 So.2d 467 (La. App. 1st Cir.1988), writ denied, 539 So.2d 632 (La.1989); Latiolais v. Jernigan Brothers, Inc., 520 So.2d 1126 (La.App. 3d Cir.1987); Wright v. Insurance Co. of North America, 491 So.2d 161 (La.App. 3d Cir.1986).

Motion to Strike
On November 30, 1990, two days after close of the trial on the merits, Dr. Albright again examined plaintiff and, subsequently, composed a "Clinic Note."[1] Soon thereafter, claimant's attorney forwarded the report to the hearing officer and to defense counsel; however, different letters accompanied each of the two copies of the document. Although plaintiff asked the hearing officer to file the doctor's narration into the record for consideration, the correspondence to the opposing attorney in no manner indicated that the "Clinic Note" had been provided to the arbiter. In fact, defense counsel later asserted that he did not become aware of this situation until November 1, 1991, while reviewing the appellate record in the course of preparing a brief. Immediately, appellants sought relief from this court in the form of a Motion to Remand or, in the Alternative, Motion to Strike and Motion for Attorney Fees.
Although referring the motion to the merits of the pending appeal, a writ panel of this court ordered the hearing officer to disclose whether the report had been considered in rendering judgment. Via a letter of December 6, 1991, she responded that, as the "Clinic Note" had not been filed into evidence, the document did not influence her decision.
It is well settled that the court of appeal cannot examine evidence that is not properly in the record either because it has been unsuccessfully offered into evidence or not offered at all. Allen v. IMTC, Inc., 567 So.2d 1155 (La.App. 3d Cir.1990); Perkins v. Fontenot, 548 So.2d 369 (La.App. 3d Cir.1989). Consequently, of course, we have by no means directed our review of the case at the report in question.
Obviously, an attorney acts improperly in the ex parte submission of information to the fact-trier. Such unprofessional conduct gives the strong suggestion of an intent to gain an unfair advantage over an adversary. Although, at oral argument, defense counsel stated that striking the controversial report from the record at this late date would serve little purpose, we visualize a remedial and corrective aspect in such a procedure. Thus, we order Dr. Albright's narrative of November 30, 1990 stricken from the record, and award attorney's fees for the bringing of the motion. Based on the record, we deem the amount of $500 to be reasonable.

*137 CONCLUSION
Accordingly, for the foregoing reasons, we reverse the hearing officer's award of supplemental earnings benefits, penalties, and past and future medical expenses. Costs of these proceedings are assessed to appellee.
Furthermore, on motion of defendants, it is ordered that the "Clinic Note" of Dr. James Albright, dated November 30, 1990, be and it is hereby stricken from the record of this case. Reasonable attorney's fees in the amount of $500 are assessed in favor of movants and against plaintiff's counsel.
REVERSED.
NOTES
[1] At counsel's request, the hearing officer held the record open for the deposition of Dr. Aaron, and bills for certain services previously rendered. However, the record had been closed as to any other evidence.