389 So.2d 1139 (1980)
Henderson JOHNSON, Plaintiff-Appellee,
v.
FIREMAN'S FUND INSURANCE CO. et al., Defendants-Appellants.
No. 7669.
Court of Appeal of Louisiana, Third Circuit.
October 8, 1980.
J. Rodney Ryan, Jr., of Breazeale, Sachse & Wilson, Baton Rouge, for defendants-appellants.
Knoll & Knoll, Kerry L. Spruill, Marksville, for plaintiff-appellee.
Before GUIDRY, SWIFT and DOUCET, JJ.
GUIDRY, Judge.
The plaintiff-appellee, Henderson Johnson, brought this suit to recover workman's compensation benefits. Defendants are Cooper Heat, Inc., the plaintiff's employer, and Fireman's Fund Insurance Company, the compensation insurer. The trial court rendered judgment in favor of the plaintiff awarding temporary total disability benefits for a total of eleven weeks as well as penalties and attorney's fees in the amount of $500.00. We reverse.
The accident in question occurred on July 15, 1978, while the plaintiff was working for defendant, Cooper Heat, Inc., at the Exxon refinery in Baton Rouge. The plaintiff was attempting to plug the receptacle of a machine into its power source when a large flash occurred, apparently caused by a short circuit in either the receptacle or the power source. As a result of the short circuit, the plaintiff sustained flash burns around his face and eyes.
The issue before us is whether or not the trial court erred in its factual determination that the flash burns caused the plaintiff to be temporarily totally disabled.
It is well settled that the standard for an appellate court reviewing a trial *1140 court's factual determination is that such a determination must not be disturbed absent a finding of manifest error. Canter v. Koehring Company, 283 So.2d 716 (La.1973). This standard was refined in Arceneaux v. Domingue, 365 So.2d 1330 (La.1978), when the Supreme Court added:
"Manifestly erroneous in its simplest terms means clearly wrong . . . Therefore, the appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the finding of the trial court; there must be a further determination that the record establishes that the finding is not clearly wrong."
Our review of the entire record reveals that the decision of the trial court is clearly wrong.
The record reveals that immediately after the accident, the plaintiff was examined at Doctors Memorial Hospital by the emergency room physician, Dr. Joseph Gerdes. Dr. Gerdes diagnosed plaintiff's injuries as erythema (redness), conjunctivitis of the left eye, and burns of the lower lashes. Dr. Gerdes stained the plaintiff's eye with Fluorescein and noted small corneal abrasions of a superficial nature. Dr. Gerdes then irrigated the eye, put in metimyd drops and patched the eye. The plaintiff was given medication and antibiotic drops to use in the eye.
Appellee urges that his temporary total disability resulted from corneal scarring caused by the injuries received in the accident. Plaintiff's counsel questioned Dr. Gerdes regarding the etiology of corneal scarring, specifically, if such scarring could result from corneal burns. Dr. Gerdes replied:
"A: Well, whether or not the cornea will scar ___ of course it will scar under certain circumstances, but I couldn't say that in this particular case that they would be there. If the burns are deep or if the injuries are deep, you always may have a corneal scar, but that would be apparent on examination."
In his deposition, Dr. Gerdes opined that the superficial burns sustained by plaintiff as a result of the accident were not deep enough to cause scarring. He further stated:
"Q: Doctor, Reverend Henderson Johnson complained of headaches; he complained of blurred vision; he complained of the sunlight greatly affecting his vision. Doctor, these complaints ___ he had these complaints following the accident, the industrial accident, and he complained of the headaches and the blurred vision for a period of six to ten weeks after the accident. They continued through that length of time. Would this be consistent with this type of injury.
A: No, I don't believe it would be.
Q: Would you expect a person with this type injury to have had blurred vision after the accident for a period of . . . for several weeks, say?

A. No, I do not think he would have blurred vision for several weeks.

Q: Do you think that he would have had headaches and the sunlight would have bothered his vision?

A: My opinion is there may have been a few days when that may have occurred, but that should have resolved rapidly." (Emphasis added).

After he examined the plaintiff, Dr. Gerdes recommended that the plaintiff see Dr. Lionel Smith, an ophthalmologist. On July 17, 1978, two days post accident, Dr. Smith examined the plaintiff and noted minor irritation of the cornea but did not find any scarring. He testified as follows:
"Q: Doctor, given your objective findings on the last examination, 7/19/78, are you able to attribute any sort of a disability to that eye that would keep this man from working for any appreciable period of time?

A: He should have been able to work by the last time that I saw him. Normally we see these people until they are completely healed just for this purpose, to prove that. But he was able to work by the last visit that I saw him and should have no permanent disability. Now, his vision was not back to normal at the last *1141 time that I saw him, but this can be attributed to the dilation which we did on purpose as part of his treatment.

Q: And that would last for one week or so I think you stated?
A: A week.
Q: He would be able to work, though, during this period of time?
A: Correct.
Q: Doctor, given your objective findings are you able to say whether Mr. Johnson would have had an appreciable amount of pain in that eye for any time after this accident?
A: No, only a moderate amount of pain for the first thirty-six to forty-eight hours.
Q: And after the forty-eight hours little or no pain?
A: Little or no pain.
Q: In summary, then, you felt that within forty-eight hours after you initially saw him that he was in good enough physical condition that he could return to work if he chose to do so?
A: Correct."
Plaintiff complained of problems after his last visit to Dr. Smith on July 19, 1978, but did not seek additional medical treatment until December 27, 1978, at which time he was seen by Dr. Crayton A. Fargason. Dr. Fargason noted that the plaintiff's objective examination was normal although there was evidence of refractive error and color-blindness. Dr. Fargason stated that these problems were not related to the accident. Specifically, he stated:
"Q: Now, doctor, assuming that he had some trauma to the eye in July ___ I think it was July 15, 1978 ___ were you in any way able to attribute the refractive error or the color-blindness to that particular accident or was this something that you determined to be congenital in nature?
A: I could not find any relationship to the accident.

Q: Doctor, at the time that you saw Mr. Johnson, was he in any way disabled from performing regular job duties because of some sort of eye disability in his capacity as a laborer?
A: Not that I could see, no." (Emphasis added).
In finding that the plaintiff was entitled to temporary total benefits, the trial court observed:
"Dr. Joseph Gerdes, the original attending physician, testified that corneal scarring could result from burns to the cornea and that such scarring could distort or impair vision permanently."
The only evidence that supports the above statement is the previously quoted stated by Dr. Gerdes as follows:

"A: Well, whether or not the cornea will scar ___ of course it will scar under certain circumstances, but I couldn't say that in this particular case that they would be there. If the burns are deep or if the injuries are deep, you always may have a corneal scar, but that would be apparent on examination." (Emphasis added).

This was the only reference in the testimony that links the accident to the plaintiff's complaints. Clearly, in the context in which this testimony was given, it cannot support plaintiff's recovery. Dr. Gerdes' statement was that deep corneal burns could cause corneal scarring, but it would be apparent upon examination of the eye. However, Dr. Gerdes, as well as the other two doctors who testified, were clear in their opinions that the plaintiff did not have deep burns and that there had been no scarring.
The only evidence in the record that supports a finding that the plaintiff is entitled to benefits is the plaintiff's own testimony. Appellee cites St. Pe v. Howard P. Foley Electric Company, 341 So.2d 639 (La.App. 4th Cir. 1977) for the proposition that lay testimony has great probative value in establishing certain facts such as existence and location of pain and actual ability or inability of claimant to perform certain physical functions or to pursue his regular employment. However, the circumstances of that case may be distinguished from the case presently before our court. In St. Pe, supra, the medical testimony was in conflict. *1142 Further, the treating physician substantiated the plaintiff's claims and the court gave great weight to his testimony noting that he had a greater opportunity to observe the plaintiff over an extended period of time as compared to the other testifying physicians. In the present case, the medical testimony is not in conflict. All of the medical testimony clearly indicates that plaintiff's injury did not result in temporary total disability such as to entitle him to workmen's compensation benefits. The relationship between lay testimony and medical testimony is discussed in Tantillo v. Liberty Mutual Insurance Company, 315 So.2d 743 (La.1975) as follows:
"It is generally true that medical testimony which is not in conflict cannot be overcome by lay testimony. Nevertheless, in every case it is the totality of the evidence, medical and lay, which must be examined by the court in making its determination of whether to grant an award for disability. Great weight, almost to the point of exclusion of other evidence, is given to uncontradicted medical evidence which is directed toward a complex scientific question. However, in all cases, it is the judge's function to determine the weight which is to be accorded the medical testimony as well as the lay testimony."
In the present case, we are mindful that it is the judge's function to determine the weight of the testimony given at trial. However, as stated above, great weight, almost to the exclusion of other evidence, should be given to the uncontradicted medical evidence. The evidence before us is direct evidence and it deals with a complex scientific question.
In summary, when considering the uncontradicted testimony of the three attending physicians, who were uniform in their statements that the accident in question could not cause more than a brief discomfort to the plaintiff, we must find that the trial court's awarding of compensation benefits is clearly wrong.
For the above and foregoing reasons, the judgment of the trial court is reversed and plaintiff's suit against the defendants is dismissed with prejudice. All costs at the trial level and on appeal are to be taxed against the plaintiff-appellee.
REVERSED AND RENDERED.