630 So.2d 706 (1994)
Wilman ALEXANDER
v.
PELLERIN MARBLE & GRANITE.
No. 93-C-1698.
Supreme Court of Louisiana.
January 14, 1994.
*707 Randall S. Iles, Aubrey, Hoffman & Iles, Lafayette, for applicant.
Denis P. Juge, New Orleans, Kelann E. Larguier, Sutherland, Juge, Horack & Dwyer, Metairie, for respondent.
ORTIQUE, Justice.[1]
Wilman Alexander, plaintiff herein, appeals a court of appeal decision, affirming the judgment of a Hearing Officer for District 4 of the State of Louisiana Office of Workers' Compensation. The Hearing Officer denied plaintiff's claim for temporary total disability benefits from April 20, 1990 through January 31, 1991. To this limited extent, the actions of the courts below are in error and must be reversed.

FACTS
Plaintiff is employed by defendant Pellerin Marble & Granite. Plaintiff's job requires that he perform heavy manual labor. On August 22, 1989, plaintiff was injured while cleaning a tomb in a cemetery in New Iberia, Louisiana. As plaintiff and others in his work crew were breaking a double tomb using a sledge hammer and jackhammer, plaintiff lost his balance and as he attempted to prevent himself from falling, he stepped on a piece of concrete. The piece of concrete had a piece of reinforcement wire protruding from it. The wire went through plaintiff's right shoe and into his foot, causing injury.
Subsequent to the accident, Barry Coco, plaintiff's foreman, gave him Epsom Salt and peroxide for soaking his foot until he could see a doctor the next day. Plaintiff's foot was swollen and red, leaving him unable to wear a shoe without cutting the shoe. The next day, a secretary at Pellerin advised plaintiff to see a doctor. Later that day, plaintiff saw Dr. Marelle Yongue in Breaux Bridge; Dr. Yongue gave plaintiff an injection for tetanus and prescribed pain medication. Plaintiff was told to return to work the next week. Plaintiff returned to Dr. Yongue several times complaining of pain and swelling. Eventually, Dr. Yongue referred plaintiff to Dr. Luke Bordelon in Opelousas, an orthopedic surgeon specializing in foot, ankle and knee surgery.
Plaintiff began seeing Dr. Bordelon in October, 1989. At that time, Dr. Bordelon discovered infection in plaintiff's foot, but prescribed no medication; he also noted a healed puncture wound. A radiology report on x-rays taken in September, 1989, indicated that plaintiff suffered from low grade pyarthrosis in the first metatarsal joint.[2] Plaintiff continued to take medication prescribed by Dr. Yongue. Dr. Bordelon prescribed orthopedic shoes which plaintiff wore until the swelling returned. When the swelling returned, plaintiff discontinued wearing the shoes due to his inability to get his right shoe on. Plaintiff complained that his foot was sore underneath and burned. Drs. Yongue and Bordelon ordered a bone scan and x-rays in an attempt to diagnose plaintiff's problem. Plaintiff's bone scan, done in December, 1989, revealed a slight increase in activity at the head of the first metatarsal. A blood test revealed a normal white cell count. Dr. Bordelon noted that the changes in the activity in the head of the first metatarsal might be post traumatic and degenerative *708 in nature. Plaintiff walked with crutches at the time of his visit; however, Dr. Bordelon found that his use of crutches was out of line with the results of his orthopedic exam and laboratory studies.
On April 11, 1990, at the request of State Farm, plaintiff saw Dr. Clifton W. Shepherd, an orthopedic surgeon. Plaintiff advised Dr. Shepherd of the pain he was experiencing and was told to return in two weeks. He was advised to continue attempting to walk on his foot despite persistent symptoms of pain and swelling. Dr. Shepherd characterized plaintiff's limp as one involving mostly upper body movements and indicated that plaintiff spent as much time on his right foot as his left. Dr. Shepherd also noted that following his examination, plaintiff walked without a limp. A physical examination revealed that there was no break in the skin and that plaintiff's foot was not swollen nor was the temperature of his foot above normal. The x-rays ordered by Dr. Shepherd appeared to be normal. Dr. Shepherd released plaintiff to return to work without restrictions on April 26, 1990, finding plaintiff's complaints out of proportion to objective findings.
Dr. Shepherd ordered a Gallium scan of plaintiff's foot in September, 1990. The scan revealed no abnormalities.[3]
Dr. Bordelon reevaluated plaintiff on April 2, 1990, finding slight tenderness beneath the first metatarsal, but found no other abnormalities. Plaintiff's right and left feet, ankles and calves were equal in measurement. X-rays showed no abnormality other than a small spur of the sesamoid.[4] Dr. Bordelon observed that plaintiff's restriction of motion upon ambulation was not consistent with his physical findings. From an orthopedic standpoint, Bordelon found no evidence of a physical impairment.
Plaintiff was paid Temporary Total Disability benefits from August 22, 1989 through April 20, 1990. As a result of Dr. Shepherd's opinion that plaintiff could return to work without restrictions, State Farm, Pellerin's workers' compensation carrier, discontinued compensation payments.
In May, 1990, plaintiff saw Dr. Ken McCarron, an internist, complaining of pain. Dr. McCarron reviewed the results of previous tests and determined that the bone scans showed abnormal activity and recommended that plaintiff allow someone to go inside his foot. In August, 1990, Dr. McCarron ordered an MRI of plaintiff's foot, which showed no abnormalities. When plaintiff saw Dr. McCarron in September, 1990, Dr. McCarron noted that his right foot was swollen but found no pus or redness. No pain medication was prescribed; as a result, plaintiff saw Dr. Weinstein in Arnaudville who prescribed pain medication, which only temporarily relieved his pain.
Plaintiff was seen in the Emergency Room of University Medical Center on October 9, 1990, complaining of pain and swelling in his right foot whenever he attempted to wear a shoe. According to his medical records, plaintiff indicated that he had stuck a wire in his foot a few weeks before this visit. On the same day, it appears that plaintiff told a nurse that he had stuck a wire in his right foot a few months before. Dr. Joseph N. Abraham examined plaintiff and found a small discolored area on the bottom of plaintiff's right foot at the base of his great toe. Plaintiff also complained of leg pain. Dr. Abraham diagnosed plaintiff as having a foreign body in his foot. After administering a local anesthetic, Dr. Abraham removed a piece of rusted wire from plaintiff's foot.
Subsequent to the removal of the rusted piece of wire from plaintiff's foot, plaintiff returned to the University Medical Center Emergency Room on October 24, 1990, *709 where he was seen by Dr. C. Prejean. Plaintiff complained of pain in his right lower leg, of several months' duration. Plaintiff told Dr. Prejean about the previous puncture wound. An x-ray revealed that no foreign body was present in plaintiff's foot at that time. Dr. Prejean removed some skin from the area under plaintiff's great toe and discharged him.
In response to State Farm's termination of plaintiff's workers' compensation benefits, plaintiff filed a claim for workers' compensation with the Office of Workers' Compensation for District 4 and trial of the claim was set for September 12, 1990; however, trial did not actually begin until January 3, 1991. The trial recessed on January 3, 1991, and resumed January 31, 1991. The hearing officer rendered a partial decision, finding that, as of the date of the hearing, plaintiff was not entitled to compensation benefits from January 3, 1991 forward and ordered him to return to Dr. Bordelon at State Farm's expense. The question of plaintiff's entitlement to compensation from April, 1990 through January 31, 1991, was left open for the taking and submission of depositions of emergency room physicians at University Medical Center as well as the deposition of Dr. Kenneth McCarron. The judgment also required plaintiff to attempt to return to work with Pellerin Marble & Granite by January 7, 1991.
On June 6, 1991, a new hearing officer heard oral arguments on the case as the hearing officer who began the trial was no longer with the District 4 office. The new hearing officer took the case under advisement and on January 13, 1992, rendered judgment in favor of defendant and against plaintiff, finding that plaintiff failed to show by a preponderance of the evidence that he is entitled to Temporary Total Disability benefits during the period of April 20, 1990 through January 7, 1991.
Plaintiff appealed and the court of appeal affirmed the judgment of the second hearing officer on the ground that she was not clearly wrong in finding that plaintiff was not entitled to compensation from April, 1990 through January 31, 1991.
Plaintiff asks this court to reverse the lower court decisions on the grounds that the court of appeal applied the manifest error standard of review erroneously. Plaintiff's argument is based upon the premise that because the case was decided by a hearing officer whose decision was based solely on the review of the trial transcript rather than upon the observation of live witnesses, this standard of review should not have been applied. Plaintiff also argues that the court of appeal erred in affirming the hearing officer's conclusion that plaintiff failed to prove his entitlement to Temporary Total Disability benefits from April 26, 1990 through January 7, 1991. The court of appeal and the Hearing Officer erred, according to plaintiff, when they failed to assess penalties and/or attorney fees against State Farm for arbitrary and capricious denial of Temporary Total Disability benefits from April 26, 1990 through January 7, 1991.
We reverse the judgment of the hearing officer on the ground that the evidence does not support the finding that plaintiff was not entitled to Temporary Total Disability benefits from April 26, 1990 through January 7, 1991. We reverse the judgment of the court of appeal despite its having applied the appropriate standard of review, on the ground that it affirmed a judgment not supported by the evidence.

STANDARD OF REVIEW
Plaintiff argues that the court of appeal erroneously applied the "manifest errorclearly wrong" standard of review in this case. The application of this standard of review is, according to plaintiff, precluded because the hearing officer decided the case on the basis of a trial transcript, documentary evidence and deposition transcripts and was therefore unable to determine witness credibility.[5] For this reason, plaintiff argues *710 that the hearing officer's decision is not entitled to the level of deference required when a hearing officer is physically present to observe the testimony of witnesses. We disagree.
The appropriate standard for appellate review is the "manifest error-clearly wrong" standard, which precludes the setting aside of a trial court or jury's findings of fact unless those findings are clearly wrong in light of the record reviewed in its entirety. Rosell v. ESCO, 549 So.2d 840 (La.1989).
The same standard of appellate review applicable to factual findings of district courts is also applicable to the factual findings of an administrative body or hearing officer. Walters v. Department of Police, 454 So.2d 106 (La.1984); Casse v. Dept. of Health & Hospitals, 597 So.2d 547 (La.Ct.App. 1st Cir.1992); Alfred v. Mid-South Machine, Inc., 594 So.2d 937 (La.Ct.App. 3rd Cir.1992); Courtney and Courtney, Inc. v. Scott, 589 So.2d 78 (La.Ct.App. 2nd Cir.1991); Garcia v. State, Department of Labor, 521 So.2d 608 (La.Ct.App. 1st Cir.1988).
Jurisprudence clearly establishes that in workers' compensation cases, the appropriate standard of review to be applied by appellate courts is the "manifest error clearly wrong" standard. Bruno v. Harbert International, Inc., 593 So.2d 357 (La.1992), citing, Gonzales v. Babco Farms, Inc., 535 So.2d 822 (La.Ct.App. 2nd Cir.), writ denied, 536 So.2d 1200 (La.1988); Rosella v. DeDe's Wholesale Florist, 607 So.2d 1055 (La.Ct. App. 3rd Cir.1992); Britton v. Morton Thiokol, Inc., 604 So.2d 130 (La.Ct.App. 2nd Cir. 1992); Alfred v. Mid-South Machine, Inc., supra; Key v. Insurance Company of North America, 605 So.2d 675 (La.Ct.App. 2nd Cir. 1992); Broussard v. Grey Wolf Drilling Co., 562 So.2d 1006 (La.Ct.App. 3rd Cir.1990); Dixon v. Louisiana Restaurant Ass'n Through Self Insurers Service Bureau, 561 So.2d 135 (La.Ct.App. 3rd Cir.1990); Sinegal v. Louisiana Blasters, Inc., 546 So.2d 308 (La.Ct.App. 3rd Cir.1989); Bordelon v. Ranger Insurance Co., 413 So.2d 962 (La.Ct. App. 3rd Cir.1982); Hookfin v. Schwegmann Bros. Giant Super Markets, Inc., 398 So.2d 1218 (La.Ct.App. 4th Cir.1981); Newell v. United States Fidelity & Guaranty Co., 368 So.2d 1158 (La.Ct.App. 3rd Cir.1979); Butts v. Insurance Co. of North America, 352 So.2d 745 (La.Ct.App. 3rd Cir.1977), writ refused, 354 So.2d 206 (La.1978); Stokes v. Continental Insurance Co., 345 So.2d 1200 (La.Ct.App. 1st Cir.1977).
The manifest errorclearly wrong standard must be applied even where the evidence before the trier of fact consists solely of written reports, records and depositions. Virgil v. American Guarantee and Liability Ins. Co., 507 So.2d 825 (La.1987); France v. A & M Wood Co., 566 So.2d 106 (La.Ct.App. 2nd Cir.1990).
We find that the court of appeal did not err by applying the manifest error standard of review. Application of the manifest error standard of review does not however, mandate the affirmance of a lower court decision with respect to findings of fact. Where an appellate court finds manifest error, the factual findings of the trier of fact may be reversed. Lewis v. Piccadilly, Inc., 489 So.2d 984 (La.Ct.App. 1st Cir.1986); Johnson v. Fireman's Fund Ins. Co., 389 So.2d 1139 (La.Ct.App. 1st Cir.1980); Istre v. Hudson Engineering Corp., 386 So.2d 366 (La.Ct. App. 3rd Cir.1980), cert. denied, 392 So.2d 1067 (La.1981). See W. MALONE & A. JOHNSON, WORKERS' COMPENSATION LAW AND PRACTICE, REPRINTED IN 12 LOUISIANA CIVIL LAW TREATISE § 257, at 563 (2nd ed. 1980).
In order to determine whether there was manifest error, the record must be reviewed in its entirety. If an appellate court finds manifest error, it is required to determine the facts de novo from the entire record. Rosell v. ESCO, 549 So.2d 840, 845 (La.1989); Gonzales v. Xerox Corp., 320 So.2d 163 (La.1975).

MEDICAL EVIDENCE
Despite his conclusion that plaintiff's complaints and use of crutches were out of line with his orthopedic examination and laboratory studies, Dr. Bordelon in a February 19, 1990 letter to Dr. Marelle Yongue, indicated that plaintiff's bone scan showed a slight increase in activity at the head of the first *711 metatarsal. Dr. Bordelon appears to have based his statement regarding the bone scan results on a radiology report dated December 11, 1989. That report indicated a "significant increase in uptake of the first MTP joint."[6] The focus of the increased uptake was in the proximal head of the first metatarsal. In an October 18, 1989 letter to Dr. Yongue, Dr. Bordelon noted that he observed a healed puncture wound and indicated that plaintiff's bone scan was "a little hot." Radiology reports dated October 3, 1989 and September 6, 1989 indicated a significant uptake in the first MTP joint due to traumatic, inflammatory changes and the presence of low grade pyarthrosis, respectively. These scans were not normal despite being characterized as such by Dr. Bordelon.
Dr. Bordelon's reevaluation of plaintiff on April 2, 1990, revealed a slight tenderness beneath the first metatarsal. He noted no other abnormalities and determined that "from an orthopedic standpoint, there was no evidence of physical impairment." Subsequent to plaintiff's reevaluation by Bordelon, Dr. Shepherd advised State Farm that plaintiff could return to work without restrictions although Dr. Bordelon's opinion was given solely from an orthopedic standpoint.
Plaintiff continued to have pain and saw Dr. Kenneth McCarron, an internist, in May, 1990. Reviewing previous bone scans, Dr. McCarron concluded that the scans showed abnormal activity. In a June 4, 1990 letter to plaintiff's attorney, Dr. McCarron advised that he suspected an underlying residual injury, possibly the presence of a foreign body, osteomyelitis or chronic infection. Dr. McCarron indicated that in his opinion, further studies were needed. On Dr. McCarron's orders, plaintiff underwent an MRI[7] and x-rays. The MRI performed on August 27, 1990 appeared normal.
When plaintiff next saw Dr. McCarron, an examination of his foot revealed swelling and tenderness over the puncture site with no pus. Dr. McCarron advised plaintiff that he believed the pain plaintiff was experiencing was due to residual damage in the soft tissues, the muscles and tendons of the feet. The tests administered by Dr. McCarron would not have shown a foreign object.[8] The hearing officer who began the trial noted in her partial ruling on January 31, 1991, that Dr. McCarron's testimony indicated that the tests administered to plaintiff would not have revealed the presence of a foreign object. Dr. McCarron also testified that it was possible that plaintiff could still experience soft tissue problems as a result of the injury which occurred in August, 1989.[9]
At the time of Dr. McCarron's deposition, September 28, 1990, he did not think plaintiff could work, stating, "he can't work like he is now."[10] Dr. McCarron recommended that plaintiff return to Dr. Bordelon or a podiatrist to determine whether there was a neuroma, a fibroma or anything else in the soft tissue causing plaintiff's pain.[11]
Johnny Conkle, State Farm Claims Supervisor, testified that he had no knowledge of Dr. McCarron's suggested referral of plaintiff to a podiatrist or that plaintiff return to Dr. Bordelon. Conkle admitted that there was no evidence that State Farm approved this recommendation despite the presence of State Farm's attorney at the McCarron deposition.
Plaintiff continued to experience pain and swelling and went to the Emergency Room *712 at University Medical Center on October 9 or 10, 1990. The physician on duty, Dr. Joseph N. Abraham, a general practitioner, observed a dark area under the ball of plaintiff's foot and suspected the presence of a foreign body. Dr. Abraham surgically removed a rusted piece of wire from plaintiff's right foot; the wire was approximately one inch in length and two millimeters in width.
The January, 1991 hearing was left open to take the deposition of Dr. Abraham. In his deposition testimony, Dr. Abraham indicated that the wire might have been deeper in plaintiff's foot prior to October 9, 1990 and worked its way closer to the surface of the skin on the sole of plaintiff's foot.[12] When asked whether the wire would have manifested its presence during an MRI or x-ray, Dr. Abraham stated that the wire would have shown up in an x-ray "like a bright light." He also testified that the MRI would have "pulled it out of his foot and thrown it across the room."[13] Dr. Abraham admitted that he was not a radiologist and that he took no x-rays prior to surgically removing the wire from plaintiff's foot; therefore, he had no personal knowledge as to whether the wire would have shown up on that particular x-ray. Dr. Abraham could not explain why the wire did not show up in previous x-rays.
Dr. Abraham also admitted that his knowledge of MRI's was limited. He found no new puncture wound to support a theory that the wire had been inserted into plaintiff's foot sometime after his last x-ray or bone scan.
We find that Dr. McCarron's testimony provided the only medical opinion that is supported by clear evidence, i.e., the presence of the wire in plaintiff's foot.

PROOF OF CAUSATION AND DISABILITY
Dr. McCarron determined that plaintiff was unable to work due to some residual soft tissue problems following the August 22, 1989 accident. This medical finding is not inconsistent with the findings of Drs. Bordelon and Shepherd who found no evidence of impairment from an orthopedic standpoint only. The fact that a foreign object was removed from plaintiff's foot is consistent with the opinion of Dr. McCarron who found plaintiff unable to work as a result of a residual soft tissue injury. The presence of the foreign object, with no evidence of its insertion post accident, casts great doubt on the conclusions and opinions of Drs. Shepherd and Bordelon with respect to disability and causation.
It was Dr. McCarron's deposition testimony that plaintiff could not work if he was required to do manual labor or remain on his feet. Plaintiff attempted to return to work after compensation was terminated. Frank Pellerin, plaintiff's employer, testified that plaintiff did speak to him about returning to work, but that he could not take plaintiff back when he was claiming disability. As a result of plaintiff's having filed a workers' compensation claim, he was not offered work of any nature.
Two witnesses were offered by defendant as impeachment witnesses. Morris Demouchet, who attends church with plaintiff, testified that plaintiff did attend church during the period at issue and that plaintiff used a cane at church. Demouchet further testified that although many church members dance during church services, he never saw plaintiff dancing during services during the period in question. Even though Demouchet was offered as a defense witness, his testimony did *713 not impeach that of plaintiff, instead, it was supportive of plaintiff's testimony. Mike Breaux, a private investigator, made video recordings of plaintiff's activities during the period in question. He testified that he had observed plaintiff running errands in his van and that plaintiff was wearing normal leather shoes; however, later, he conceded that plaintiff was wearing orthopedic shoes. On one occasion, it is alleged plaintiff was seen wearing thongs. However, this is consistent with plaintiff's claims that he could not wear regular shoes due to swelling.
The first hearing officer indicated on the record that plaintiff's right foot was larger than his left; this comment is indicative of the ability of even a person without medical training to discern a difference in the appearance of plaintiff's feet. This observation was made in January, 1991, after the wire had been removed from plaintiff's foot.
State Farm contends that plaintiff is not entitled to compensation on the ground that his problems from April 20, 1990 through January 31, 1991 were not caused by the August 22, 1989 accident. Defendants who contest the cause-in-fact relationship between a traumatic incident and injury must show that some other particular incident must have caused the injury in question in order to overcome a plaintiff's case when some symptoms of injury appear shortly after a traumatic incident that are consistent with the incident and continually worsen. Davis v. Galilee Baptist Church, 486 So.2d 1021 (La.Ct.App. 2nd Cir.1986); Miller v. Allstate Insurance Co., 221 So.2d 908 (La.Ct. App. 1st Cir.1969).
In Davis, the plaintiff was injured in an automobile accident and subsequently developed carpal tunnel syndrome. Defendant's orthopedist did not relate the syndrome to the accident because the symptoms appeared many months later and appeared in both hands. Because the syndrome is rarely reported following automobile trauma, the trial court found no relationship between the syndrome and the accident. The court of appeal held that the syndrome was caused by the accident as there was no evidence of intervening trauma. Likewise, in this case, there is no evidence of intervening trauma. Therefore, we find that the court of appeal and the hearing officer were clearly wrong in concluding that the symptoms exhibited by plaintiff after compensation was terminated were not related to the August, 1989 accident.
In brief to this court, defendant argues that although the uncontradicted testimony of a witness who is a party should generally be accepted as true; the record in this case shows circumstances casting suspicion on the reliability of that testimony. The circumstances to which defendant refers are the medical records pertaining to plaintiff's visit to the University Medical Center Emergency Room. The records reflect that plaintiff did not give the August, 1989 accident date, indicating on one occasion that his injury occurred a few weeks ago and on another occasion that his injury occurred a few months ago. The cases relied upon by defendant, West v. Bayou Vista Manor, Inc., 371 So.2d 1146 (La.1979); Jones v. Alexander, 399 So.2d 216 (La.Ct.App. 2nd Cir.), writ denied, 400 So.2d 1383 (La.1981); Lemoine v. Parish Tire & Wheel, 532 So.2d 911 (La.Ct. App. 5th Cir.1988), all involve discrepancies relating to a plaintiff's attempt to establish that a work related injury occurred and are not applicable in this case. There is no dispute that Mr. Alexander was injured on August 22, 1989, while in the course and scope of his employment with Pellerin Marble & Granite.
The hearing officer's conclusion that plaintiff was not disabled from April 26, 1990 through January, 1991 is manifestly erroneous in view of Dr. McCarron's testimony as to disability and causation which is supported by concrete evidencethe piece of wire which was removed from plaintiff's foot. The medical evidence in this case indicates that plaintiff should have been able to return to work shortly after removal of the wire from his foot. Based upon a review of the record in its entirety, we find that the court of appeal and the hearing officer were clearly wrong in so far as they found plaintiff not entitled to Temporary Total Disability benefits from April 20, 1990 through January 7, 1991 based upon the medical evidence and plaintiff's own testimony.

*714 DECREE
The judgments of the court of appeal and of the hearing officer are reversed only in so far as they find plaintiff not entitled to Temporary Total Disability benefits from April 20, 1990 through January 7, 1991. The judgments are otherwise affirmed. The cause is remanded to the hearing officer for further proceedings consistent with this opinion.
AFFIRMED IN PART, REVERSED IN PART AND REMANDED.
NOTES
[1] Pursuant to Rule IV, Part 2, Kimball, J. was not on the panel which heard and decided this case. See State v. Barras, 615 So.2d 285 (La. 1993).
[2] Pyarthrosis is a condition in which pus forms within a joint cavity. The first metatarsal is the joint at the ball of the foot. See Stedman's Medical Dictionary (25th ed. 1990)
[3] A Gallium Scan is a bone imaging diagnostic technique wherein Gallium Citrate, or some other radioactive isotope of gallium, is injected intravenously. The area being studied is viewed through an Anger-gamma camera. The gallium substance tends to localize in bones and sites of infection; therefore, care must be taken in interpreting gallium-uptake when attempting to diagnose bone or joint infections. See IMAGING OF ORTHOPEDIC TRAUMA 16-19 (Thomas H. Berquist ed., Raven Press 1992).
[4] A sesamoid is a rounded nodule of bone usually embedded in tendon. Some are a few millimeters in diameter, others are as large as the patella or knee cap.
[5] The only live witness who testified on plaintiff's behalf was the plaintiff himself. Plaintiff testified on January 3, 1991, before Hearing Officer Carolyn Perry, who left the Office of Workers' Compensation prior to the date the hearing resumed. The hearing resumed on June 6, 1991. Hearing Officer Sheral C. Kellar rendered a decision on the issue left undecided by the first hearing officer.
[6] The MTP joint refers to the metatarsal joint. A bone scan, like a Gallium Scan, involves the injection of a radioactive substance which is taken up by or collects in those areas in which there is some abnormality.
[7] Magnetic Resonance Imaging (MRI) is a diagnostic tool in which those portions of a patient's body in which it is believed that abnormalities are present are passed through a magnetic field. Pictures of the areas are taken and fed into a computer which provides multidimensional images of the areas being studied.
[8] McCarron deposition at 11-12.
[9] Id.
[10] Id. at 13.
[11] A neuroma is a general term for any neoplasm derived from cells of the nervous system. A neuroma may be traumatic in origin and involve a mass which develops at the proximal end of a severed or injured nerve. A fibroma is a benign neoplasm derived from fibrous connective tissue. See Stedman's Medical Dictionary (25th ed. 1990).
[12] Plaintiff testified that it was so difficult for him to dislodge the wire from his foot that he had to pull with both hands. This seems to support the notion of the wire being deeper in plaintiff's foot prior to October, 1990. Metallic foreign bodies may be embedded within the substance of a muscle or tendon, making detection more difficult. See ROBERT A. COOKE, 1 DISORDERS OF THE FOOT 836-37 (Melvin H. Jahss ed., W.B. Saunders Company 1982).
[13] Abraham deposition at 14. It appears that Dr. Abraham's comment was an exaggeration. Medical texts do warn of the adverse effects of metal upon the reliability of an MRI; however the fear that a metallic object may become a projectile if brought into most magnetic fields refers to external items such as snaps, clips, zippers, buttons, hairpins etc. See JAMES R. KNOWLES, MUSCULOSKELETAL IMAGING, 246-47 (John A. Markisz ed. Little, Brown & Co. 1991).