WICKER, Judge.
This appeal arises from a claim for worker’s compensation benefits by plaintiffrappel-lant, Bernard Thomas, for alleged work-related disability caused by exposure to the burning of potash and phosphorous. Thomas filed the claim for alleged blood poisoning, and injuries to his lungs and gastrointestinal system against Universal Match Corporation, defendanVappellee. The hearing officer granted judgment in favor of Universal and dismissed Thomas’ claim. Thomas now appeals. We affirm.
On appeal Thomas specifies the following errors:
1. The hearing officer erred in finding that no compensable work-related accident or incident occurred;
2. The hearing officer erred in disregarding the objective pulmonary tests which indicate plaintiffs disability;
3. The hearing officer’s failure to credit plaintiffs uncontroverted testimony is manifest error, and
4. The hearing officer’s reference to alleged similar complaints by plaintiff in 1973 as a basis for judgment is manifest error.
Appellant initially argues that the manifest error rule does not apply and suggests that this court conduct an “expansive if not exactly de novo review.” He bases this argument on the grounds that the hearing officer who rendered judgment did not base his decision on his view of the witnesses but rather on the “cold record”. The Louisiana Supreme Court has held, however, that “[t]he same standard of appellate review applicable to factual findings of district courts is also applicable to the factual findings of an administrative body or hearing officer ... The manifest error-elearly wrong standard must be applied even where the evidence before the trier of fact consists solely of written reports, records and depositions.” Alexander v. Pellerin Marble & Granite, 93-C-1698, p. 6, 630 So.2d 706, 710 (La.1994).
We note at the outset that appellant has attached two judgments to his brief and these two judgments are referred to by ap-pellee as well. The judgment before us was rendered March 23, 1993. A second judgment was purportedly rendered August 12, 1993. This court only has the judgment of March 23, 1993 and the appeal therefrom before it. The record before us does not contain the later judgment[1] nor appeal therefrom, if any. While it appears the second judgment is essentially a supplemental reasons for judgment since it does not purport to change the prior substance of the original judgment; nevertheless, we make no determination as to an issue not before this court and do not address a document which is not in the record before us. Additionally, this court previously remanded this ease for completion of the record and a supplemental *1222 record was subsequently filed. The supplement does not contain a second judgment nor a second appeal although we specifically ordered these documents to be supplemented if such documents existed.
EXPOSURE TO TOXIC CHEMICALS:
There are inconsistencies in the testimony regarding Thomas’ exposure, if any, to toxic chemicals. The hearing officer concluded there was “no compensable work-related accident or incident.” He also noted Dr. Robert N. Jones, a pulmonary disease expert, found no evidence of lung or respiratory disease from exposure to chemicals. We find no manifest error.
Thomas testified he began burning materials for six months from January, 1990 to June, 1990. On June 15,1990 he noticed the following symptoms: swollen stomach, nausea, dizziness, breathing problems, and a metallic taste in his mouth. He denied having any respiratory problems before he began burning the chemicals, although he admitted having suffered prior injuries in 1968 when the muscles and tissues of his chest were mashed from his picking up heavy barrels.
Thomas stated he burned the following material: match waste, match boxes, match sticks, damaged potash, and old phosphorous. He burned potash and phosphorous on a daily basis. In addition to his inhaling these fumes he also stated he did some pipe fitting with glue in a non-ventilated area which also caused him to have a suffocating sensation. He testified he burned the materials from 7:00 a.m. to noon. He reported that his face would be gummy and sticky from the vapor. He stated he burned four to five hundred pounds of material each day.
Bruce Johnson, a fellow employee, testified he observed Thomas burning material on one occasion. It was Johnson’s job to load the waste material in boxes for Thomas to burn. To the best of his knowledge one box of material was burned daily.
Johnson stated that when he observed Thomas burning the waste he was doing so in the old incinerator. He told Thomas he was not supposed to be burning it there. Johnson also told Thomas he did not like smelling the fumes and did not like the way breathing it in made his chest feel. This was why he told the general manager, Charlie Gudger, that he refused to bum it. Prior to the burning the waste was washed down the drain each day. However, an environmental agency wanted this practice discontinued.
Although Johnson testified he observed Thomas’ exposure to fumes on one occasion, the hearing officer gave greater weight to the testimony of Charlie Gudger.
Gudger testified by deposition. He stated that the smoke from the burning of the materials would go up a stack. There were two incinerators, both of which were used ones. Even in the older incinerator the majority of the smoke would go up a smoke stack. Although Thomas testified he burned potash, no raw form of potash was burned. Only small amounts of chlorate of potash as part of the match waste were burned.
Additionally, although Thomas testified he burned four to five hundred pounds of material each day, Gudger stated large quantities of raw chemicals were not burned. He explained that match waste consists of chemicals but in minute quantities. He estimated less than one percent of the waste material swept up from the printing room, where Johnson worked, consisted of chemicals.
Gudger also testified neither Thomas nor any other employee came to him complaining of breathing problems as a result of burning match waste.
Gudger stated Thomas was terminated because he was working at a janitorial job.[2] *1223 Thomas admitted he ran a janitorial company but stated this was known by the company and that he only worked in a supervisory capacity. He testified he was unable to continue working in his business after he became ill. The business closed in October or November of 1990.
Gudger’s testimony that Thomas could only have been exposed to minute quantities of chemicals, the majority of which went up a smoke stack when burned, is supported by the testimony of Dr. Jones regarding the absence of any indication of damage due to chemical exposure.
Dr. Jones testified by deposition. He stated that the type of injury which might result from long-term exposure to burning an irritant such as phosphorous would be that if a sufficient quantity was inhaled these might irritate and inflame the bronchial tubes. On a physical examination there might be evidence of sneezing or obstructive breathing. Dr. Jones looked at Thomas’ chest x-rays to determine whether he had evidence of a collection of mineral components from the match formula. He received the formula by letter from Universal. Dr. Jones testified there was no evidence on the x-rays of a collection of mineral components. There was also no evidence of lung scarring. He did not find any effect.
Dr. Jones gave a breathing test to Thomas to check for obstruction. His results were inconclusive because Thomas did not breath forcefully. Instead, Thomas complained of chest pain. Dr. Jones, however, did have a report from Dr. Brown which showed relatively good values on breathing tests. Dr. Brown, however, had interpreted these tests as indicating mild restrictive ventilatory impairment. Dr. Jones explained:
relatively good values were obtained for his forced vital capacity and forced expiratory volume in one second that despite the fact he only blew for about a second and a half into this measuring device when you are supposed to blow for at least seven seconds. So given that he gave a very short breath, the fact that he got out more than half of predicted would indicate to me that his capacities at that point were probably normal and that if he had performed testing maneuver properly normal results would have been obtained.
* ⅜ # * * *
The statement in Dr. Brown’s letter which is dated October 22, 1990 appears to be based on the August 1990 chest end results which Dr. Brown did not seem to recognize were, in fact, submaximal effort and underestimated his true capacity. If you take that into account, there isn’t any evidence that he has restrictive impairment. A restrictive impairment refers to lungs that contain less than the normal amount of air and if you only blow part of the air out you will be measured as having only part of what you actually do have and that’s what happened in the testing of August 20,1990.
Dr. Jones testified although he blew for one and a half seconds his values for that short period of time were near normal. If he had exhaled fully he would have clearly been normal. He exhaled 62% of the amount he should have been able to had he blown for seven seconds.
Dr. Morton Brown, a pulmonary specialist, testified he felt the breathing studies consistently indicated Thomas’ lungs were mildly restricted. However, he also testified that on October 25, 1990 he wrote to Universal asking for further diagnostic studies in the toxological and gastrointestinal field. He stated that from the external evidence he had then Thomas would be able to work; however, Thomas kept telling him he was sick and he felt Thomas was telling him the truth.
Dr. Brown admitted getting inconsistent results on testing. He stated that in. September 1990 Thomas’ spirometries were varied ranging from a high of 59 to 60 to a low of 35. Most of the time the figure was in the mid 40 range. He explained that normal was 81 or above.
*1224 Dr. Brown testified the West Jefferson studies done February 25, 1991 were inconsistent. He interpreted these studies as showing no more than 50% of his lungs were being used.
Dr. Brown also admitted that on more than one occasion Thomas did not put out sufficient effort and that these breathing tests are dependent on the effort put forward. As a result it makes it difficult to assess. Externally Dr. Brown could find no evidence to cause Thomas to produce less effort on the breathing tests.
The hearing officer also noted Dr. Jones’ view that Thomas had made similar complaints in 1973 and was found at that time to be in good health but in need of psychiatric treatment. In brief, counsel for appellant argues this finding is incorrect.
Dr. Jones was relying on a report by Dr. Oscar J. Bienvenu, Jr. at the Ochsner Clinic. This report is dated July 16, 1973. The report describes the following symptoms: chest pain, lower back pain, painful urination, numbness in legs, numbness in arms, falling, numbness inside, pain in eyes, headaches, and dizziness. Dr. Bienvenu felt most of his complaints were functional and recommended he see a psychiatrist. He noted Thomas was hostile when told all of his tests indicated good health.
Dr. Jones reported Thomas complained to him of the following: chest discomfort, headache, weakness, drowsiness, loss of weight, blurry vision, metallic taste, dizziness, abdominal swelling, shortness of breath, swollen stomach and rash on trunk and extremities.
Dr. Jones correctly noted Thomas had made similar complaints in 1973. In both 1973 and currently Thomas had complained of chest pain, headaches, and dizziness. He also complained of pain in his eyes in 1973 and complained currently of blurriness. Appellant correctly notes that there are other different symptoms between these two dates. However, while Dr. Jones commented on the similarities he based his opinion on the recent information. He clarified his position by stating in his report dated January 8, 1991:
Nothing in the more recent records of Dr. Brown or other physicians establishes the probability of serious chest or abdominal disease.
The finding of similarity between some of the complaints was not the sole reason given by the hearing officer. He also relied on Dr. Jones’ finding of no evidence of lung or respiratory disease.
Accordingly, for the reasons stated, the judgment dismissing Bernard Thomas’ claim for worker’s compensation is affirmed.

AFFIRMED.

. The purported August 12, 1993 judgment renders the same judgment as the previous one but gives further reasons for doing so.

. Appellant argues in brief the hearing officer’s reference to the termination suggests a finding on his part that Thomas was physically able to work. However, the hearing officer only mentioned the termination in the context of explaining that Gudger's testimony included this aspect while Johnson made no mention of it. The hearing officer never stated he was relying on the *1223 circumstances for termination as an indication Thomas was able to work.