635 So.2d 620 (1994)
Barbara BENOIT, Plaintiff-Appellant,
v.
PET, INCORPORATED, Defendant-Appellee.
No. 93-1019.
Court of Appeal of Louisiana, Third Circuit.
April 6, 1994.
*621 James Richard Leonard Jr., Lafayette, for Barbara Benoit.
William Fredrick Page Jr., Lafayette, for Pet, Inc.
Before YELVERTON, SAUNDERS and DECUIR, JJ.
YELVERTON, Judge.
Barbara Benoit appeals a hearing officer's denial of worker's compensation benefits and medical expenses. We reverse and award.

FACTS
Benoit, 46, was employed as a rice cooker by PET, Inc. On March 15, 1989, she lifted a tub of rice and injured her back. She received worker's compensation benefits from March 16, 1989 to February 6, 1990, at which time she returned to work after being released by the doctor. When Benoit returned to work, she was given a job as a packer.
Shortly thereafter, Benoit suffered another work-related accident on February 14, 1990 when she slipped and fell on condensation on the floor due to the humidity outside the plant.
Benoit filed a worker's compensation claim against PET on January 16, 1991 claiming she injured her back as a result of these two accidents and that she is unable to perform her job or any jobs as a result of her injuries. A hearing was held on May 29, 1992. The hearing officer rendered judgment awarding the claimant certain deposition costs and medical expenses, but denied further benefits finding the claimant had failed to prove disability. The hearing officer did not give reasons for judgment. Benoit appealed this judgment and PET answered the appeal. The issues relate to compensation benefits, medical benefits, and costs.

*622 WORKER'S COMPENSATION BENEFITS

The same standard of appellate review applicable to factual findings of district courts is also applicable to the factual findings of an administrative body or hearing officer. In worker's compensation cases, the appropriate standard of review to be applied by appellate courts is the "manifest error-clearly wrong" standard. Alexander v. Pellerin Marble & Granite, 93-1698, 630 So.2d 706 (La.1994).
Benoit claims she is entitled to past temporary total disability benefits and supplemental earnings benefits, as well as a recognition of her right to medical benefits, following her second accident. After her first accident on March 15, 1989, Benoit received weekly compensation benefits, and medical expenses, until she returned to work in February 1990.
At the time of her first accident, La.R.S. 23:1221(1) provided for temporary total disability benefits as follows:
(1) Temporary total. For injury producing temporary total disability of an employee to engage in any self-employment or gainful occupation for wages whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of injury was particularly fitted by reason of education, training, or experience, sixty-six and two-thirds percent of wages during the period of such disability.
The statute further provided that temporary total benefits would cease when the physical condition of the employee had resolved itself to the point that a reasonably reliable determination of the extent of disability of the employee could be made, and the employee's physical condition had improved to the point that continued, regular treatment by a physician was not required.
After her first accident, Benoit received worker's compensation benefits until she was released to return to work without restrictions by Dr. Clifton Shepherd on January 25, 1990. Dr. Shepherd had treated Benoit, having been referred to him by Crawford and Company, the worker's compensation insurer. After her release she returned to work on February 6, 1990. She then slipped and fell on February 14. She never received any benefits as a result of the second accident.
At the time of her second accident, the law on temporary total benefits had changed slightly. La.R.S. 23:1221(1) as it was amended by Acts 1989, No. 454, Sec. 6, effective January 1, 1990, no longer required the employee to be able to engage in "gainful" occupation for wages. It was also amended to require that the claimant bear the same burden of proof for temporary total disability as for permanent disability, i.e., clear and convincing evidence.
Benoit had been seeing her chiropractor, Dr. David Eugster, since early 1988. He was seeing her for various aches and pains, including lower back problems. She saw him on February 3, 1989 for back pain. Her first accident was March 15, 1989. It was not until February 1, 1990 that she saw Dr. Eugster again. Her second accident was February 14, 1990. She had a visit scheduled with Dr. Eugster that same day, and she told him about her fall. As of her February 21, 1990 visit with him, she was still unstable but was improving. She never saw Dr. Eugster again.
Benoit was seen again by Dr. Shepherd, on March 26, 1991. He recommended that she have a CAT scan and MRI to see if there had been any anatomic changes as a result of this second accident. He again saw her on May 16 when he reviewed her MRI and CAT scan. The MRI showed degenerative changes at several discs without bulging but there was a bulge at L4-5. He then saw her again on May 29 after she had a myelogram and CAT scan. These tests showed a mild to moderate bulge at L4-5. He found that the bulge at L4-5 was more prominent in the 1991 studies compared to the 1990 studies. The bulge at L4-5 had gotten larger on the left side. He concluded that the changes in her disc could be related to the second accident, but could also be related to obesity and aging. He stated that there was no way to tell what precipitator caused the more prominent bulge.
Dr. Shepherd did not see Benoit again until January 22, 1992 when she coughed or *623 sneezed and developed back pain. Dr. Shepherd felt that the disc bulge might or might not be associated with symptoms which could be causing some discomfort. He would have no trouble with her doing light activities or moderate activities and would allow her to lift 40 pounds occasionally. He recommended physical activity but advised against excessive bending, stooping, squatting or lifting. The last time Dr. Shepherd saw Benoit was January 29, 1992 when he told her to return on an as-needed basis.
Benoit saw Dr. John Clifford, a neurosurgeon, on November 29, 1991 as ordered by the hearing officer after she had filed her worker's compensation claim. Dr. Clifford's findings at that time were that the complaints she was experiencing were secondary to multi-level degenerative lumbar spondylosis. He felt that at that time she was asymptomatic but that she would become symptomatic when she stood for long periods of time such as five to six hours. He did not feel that she was employable doing a heavy type of work, but that she could work in a capacity where she was not required to do any excessive bending, stooping, squatting, or lifting. This was the only time she saw Dr. Clifford.
Benoit returned for treatment to Dr. John Cobb, an orthopaedic surgeon, on February 17, 1992. Dr. Cobb had treated her after her first accident on a referral from her family physician and the physician for PET, Dr. James Clause. Dr. Cobb had treated her until June 7, 1989 when she went to see Dr. Shepherd.
On her return to him in 1992, Benoit reported to Dr. Cobb that she had sneezed back in January and her pain became worse. A myelogram showed a central protrusion at L4-5. When Dr. Cobb had treated Benoit for her first accident, he had diagnosed her with a possible herniated disc at L4-5. Dr. Cobb equated a bulging disc to a herniated disc. Dr. Cobb stated that a herniated disc is a manifestation of degeneration of the disc. He opined that a herniated disc can be asymptomatic and then be made symptomatic by trauma and then become asymptomatic again. He believed that Benoit had episodic nerve root impingement. This meant she did not have an extruded disc that was compressing the nerve at all times, which accounted for her having pain on some days and not on others.
Dr. Cobb felt that in order to get some additional relief from the symptoms, she should first be treated with a dynamic stabilization program. He also stated that surgery was still an option, which was what he had suggested after her first accident. Dr. Cobb saw no problem with her holding a job that was light to light/medium type work. He would restrict her lifting to no more than 35 pounds at a time and recommended that she be allowed periods of rest and changes of positions.
Under La.R.S. 23:1221(3), a claimant is entitled to supplemental earnings benefits (SEB) if the injury has resulted in the employee's inability to earn wages equal to 90% or more of wages at the time of injury. The injured employee thus bears the burden of proving, by a preponderance of the evidence, that the injury resulted in his or her inability to earn that amount under the facts and circumstances of the individual case. Once the employee's burden is met, the burden shifts to the employer, who, if he wishes to contend that the employee is earning less than he is able to earn so as to defeat or reduce SEB, bears the burden of proving that the employee is physically able to perform a certain job and that the job was offered to the employee or that the job was available to the employee in his or the employer's community or reasonable geographic region. Freeman v. Poulan/Weed Eater, 630 So.2d 733 (La.1994); Daigle v. Sherwin-Williams Co., 545 So.2d 1005 (La.1989).
Benoit testified that she quit school at the age of 16 and went to work holding various jobs. She had experience as a waitress, as a bartender and as a cosmetician before going to work for PET. PET's business was food processing. Her job was to cook and pack rice. There was some confusion about her rate of pay but it was finally agreed that it was $4.15 an hour. She was 46 at the time of the first accident and had never filed a worker's compensation or other claim. After her second accident she quit PET to take a course in culinary arts at Camelot College. She said she quit because of the lack of *624 hours, and because she wanted to get into something that she felt would be less strenuous because she was having very bad back problems. She was in this school from April 26 to July 2 of 1990, getting a certificate in culinary arts, which is kitchen work. After that she went to work for Cornerstone at $4.00 as a cook's helper. They allowed her to work only five hours a day and the amount of pain she had depended on how much she had to stand in the same place for the work that she had to do. She was unable to find a job until March of 1991 when she went to work for Juanita's Restaurant as a cook's helper at $4.00 an hour. She stayed there until April 1991 and because of the intense back pain and because she could not do the work that was required of her she had to quit on April 13, 1991. She stayed unemployed until she went to work at Vermilionville on August 14, 1991, where she worked in the food and beverage department. Her pay was $4.00 an hour. She worked there until February 1992 anywhere from 28 to 40 hours a week. For a while it was okay and she really enjoyed her work there. But then they changed her job and put her in a small area where she had to stand for long periods of time in the same area on the cement floor. This caused renewed pain. She had to go on a part-time basis until she could find other employment. Finally, she got full time employment on February 14 as a baby-sitter and that was what she was doing at the time of trial, working eight hours a day at $3.00 an hour. At the time of trial her job required taking care of a five-month-old small baby. There was very little lifting and carrying and she was able to do that job quite well.
She stated that she did not tell these different employers that she had back problems because they would not hire her if she had. She also explained that when she left she gave them the explanation that she was not getting enough hours, and that this explanation also was to protect her for applications for future jobs.
The statute contemplates reducing whatever wages were earned to a weekly basis. Daigle, 545 So.2d at 1008. PET had an erratic work schedule. According to her personnel records, for the four weeks before her first injury Benoit worked an average of 29 hours a week. However, La.R.S. 23:1221 states that average monthly wages shall be computed as four and three-tenths times the wages as defined in La.R.S. 23:1021(10). La. R.S. 23:1021(10)(a) provides the formula for determining the wages of an employee paid on an hourly basis. In Benoit's situation the average weekly wage should be computed by multiplying her hourly wage rate by 40 hours. Price v. Fireman's Fund Ins. Co., 502 So.2d 1078 (La.1987). Using 40 hours a week, Benoit's average weekly wage would have been $166. This figure is then plugged into La.R.S. 23:1221(3)(a) and multiplied by four and three-tenths to equal $713.80 (average monthly pre-injury wages).
Benoit was working 40 hours a week at her baby-sitting job for an average weekly wage of $120. This amount, plugged into La.R.S. 23:1221(3)(a) and multiplied by four and three-tenths, comes out $516 (average monthly post-injury wages). Ninety percent of $713.80 is $642.42. Thus, Benoit successfully bore her burden of proving her disability and resultant inability to earn at least 90% of her pre-injury wages.
The burden of proof thus being shifted to PET, it introduced the testimony of Gretchen Montero, a vocational rehabilitationist, to show that there were jobs available to Benoit in her community that she was physically able to perform. Montero reviewed Benoit's and Dr. Shepherd's depositions, the report of Dr. Clifford, Benoit's applications to Cornerstone, and her resume. Montero determined that an entry level sales clerk or cashier positions would be suitable work for Benoit. She contacted 54 employers and spoke to the person responsible for hiring. She testified that there were numerous positions that were open and hiring. Most positions paid $4.25 an hour.
PET proved there were jobs available to Benoit in her community which would fit her physical limitations. If the employer meets the burden of showing that the SEB claimant is physically able to perform a certain job and that that job was offered to the employee or available within a reasonable geographic region, the claimant must then counter by clear and convincing evidence, unaided by *625 any presumption of disability, that she is unable to perform the employment offered or available solely as a consequence of substantial pain. Doucet v. Baker Hughes Production Tools, 626 So.2d 948 (La.App.3d Cir. 1993).
As a result of her injuries, Benoit testified that she had to work in pain at the jobs she tried to hold. All doctors agreed that she could work, but placed restrictions on her ability to lift heavy items and stand or sit for long periods of time. Even Dr. Shepherd agreed that the tests following her second injury compared to the tests following the first injury showed that the disc at L4-5 had bulged even more. He agreed that this could be causing pain.
In a compensation action the evidence is to be viewed in a light most favorable to the claimant. Coley v. Wilson Oil Company, 620 So.2d 445 (La.App.3d Cir.1993). Benoit was 46 at the time of trial and did not have a high school education. The jobs she held before she went to work for PET, as a waitress, a bartender, a cosmetician,all required long periods of standing. The job of PET required the same. The jobs she attempted after leaving PET put requirements on her that all doctors agreed could be beyond her limits. All agreed that standing or sitting for long periods or stooping, bending, and lifting, should be limited. All testified that there were changes at L4-5 after the second accident that could cause pain. Benoit testified that she was often troubled by intense pain. She explained that her reported reasons for leaving PET and other jobs included her desire to work more hours, but that the basic reason was to seek easier, less painful, work. She testified that she hesitated to complain about her back because of the fear this would make her unemployable. Her work efforts after the accidents substantiate her sincerity and her desire to work. The causation element between the second accident and her limitations was clearly proved. Her testimony that certain work requirements caused substantial pain was not contradicted by either lay or medical or documentary evidence. In short, there is nothing in the record which casts doubt or suspicion on the reliability of her testimony. We conclude that Benoit met the proof requirements of La.R.S. 23:1221(3)(c)(ii) and that she has established that she is incapable of performing the employments offered, tendered, or otherwise proved available, solely as a consequence of substantial pain. For these reasons, we conclude that Benoit was and is entitled to Supplemental Earnings Benefits.

MEDICAL TREATMENT AND EXPENSES
Benoit also claims it was error for the hearing officer to disallow Benoit a supervised program for dynamic stabilization as recommended by Dr. Cobb. La.R.S. 23:1203 provides that the employer shall furnish all necessary medical treatment.
We note that the parties stipulated at trial that all medical expenses from the first accident had been paid. Therefore, we will address whether this medical treatment was necessary after the second accident.
The hearing officer had the benefit of three doctors' opinions as to the necessity of future medical treatment for Benoit. Dr. Clifford, noting that Benoit was asymptomatic when he saw her, opined that further "investigation" was not indicated. However, he advised that she continue wearing a supporting corset. Dr. Shepherd recommended that Benoit engage in some physical activity, but did not think her prognosis would get better or significantly worse in the future.
Dr. Cobb was the only doctor who recommended a specific course of treatment for Benoit. He recommended a supervised dynamic stabilization program to get some relief from her symptoms. He explained that this is a program in which an exercise system is used to increase muscle strength in the back. It is used to stabilize the back as opposed to doing it surgically. If this failed, he would look at surgery.
Considering that Benoit still suffers substantial pain, we find that further medical treatment as recommended by Dr. Cobb is necessary.
PET answered the appeal and contends the hearing officer erred in allowing $750 in medical expenses incurred by Benoit in seeing her chiropractor, Dr. Eugster, on *626 February 1, 1990 through February 21, 1990. PET contends that this treatment was not related to her work-related accident.
The record reveals that Benoit had been seeing Dr. Eugster prior to both of her accidents and just prior to her second accident for lower back problems. She had already had an appointment scheduled to see Dr. Eugster on February 14. Dr. Eugster testified that he was treating Benoit during this time period for the problems that he was treating her for on February 1, 1990. However, as of the February 14 visit, his notes indicate that he was treating her for a fall which was causing lower back pain and that she had a re-injury of the same condition. This treatment became necessary after her fall.
We find that it was not error for the hearing officer to conclude that any treatment Dr. Eugster administered as of February 14 was related to Benoit's fall on that same day. Benoit also saw Dr. Eugster on February 16 and February 21. An examination of Dr. Eugster's total bill for services after both accidents shows that the total charges were considerably in excess of $750. It is evident that the hearing officer exercised her discretion under La.C.C. art. 1999 in fixing this amount, and we find no abuse of discretion.
Benoit also contends the hearing officer erred in not allowing the medical charges of Dr. Cobb for his treatment of Benoit on April 27, 1992.
La.R.S. 23:1121 provides that an employee shall submit to examination by a duly qualified medical practitioner provided and paid for by the employer. It also allows the employee to select one treating physician in any field or specialty. After her initial choice, the employee shall obtain prior consent from the employer or her worker's compensation carrier for a change of treating physician within the same field or specialty. The employee is not required to obtain approval for change to a treating physician in another field or specialty.
After her first accident, Benoit first saw Dr. Clause, a family doctor, who referred her to Dr. Cobb. She wanted a second opinion, and the worker's compensation insurer sent her to Dr. Shepherd, who became her treating physician. She continued seeing Dr. Shepherd even after her second accident at work. Benoit had a coughing incident while at work at Vermilionville which caused her to develop back pain. She then returned to see Dr. Shepherd on January 22 and 29, 1992. She was told to return on an as-needed basis.
Benoit then went back to see Dr. Cobb on February 17, 1992. PET contends that Benoit selected Dr. Shepherd as the treating orthopaedist of her choice and should have obtained prior consent from it or the worker's compensation carrier before changing back to Dr. Cobb.
We do not regard La.R.S. 23:1121(B) as contemplating the situation presented in this case. The worker's compensation insurer sent Benoit to see Dr. Shepherd. Although Benoit wanted a second opinion, Dr. Shepherd was the worker's compensation insurer's choice of doctors, not Benoit's. Dr. Cobb was Benoit's choice. Therefore, even though she allowed Dr. Shepherd to treat her, we do not equate that with a change of physicians as contemplated by the statute.

COSTS
In its answer to the appeal PET also contended the hearing officer erred in awarding reimbursement to Benoit of the deposition fees of Drs. Clause and Eugster.
La.Code Civ.P. art. 1920 grants the trial court much discretion in assessing costs. We find no abuse of that discretion here, particularly in the light of our disposition of the case on this appeal.
For these reasons the judgment of the Office of Worker's Compensation Administration is reversed as to the issue of disability. Judgment is rendered finding that the claimant is entitled to Supplemental Earnings Benefits. The case is remanded to the Office of Worker's Compensation to fix the amount of those benefits.
The judgment is reversed to allow Benoit further medical treatment as Dr. Cobb recommends is necessary. The judgment is also reversed to the extent that it denied PET's liability for the payment of Dr. Cobb's charge *627 of $120. Judgment is rendered ordering the employer to pay that charge.
In the remaining respects the judgment is affirmed.
PET, Incorporated, will pay the costs of this appeal, as well as all costs below.
AFFIRMED IN PART; REVERSED IN PART; RENDERED; AND REMANDED.