# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 07-642

CHRISTOPHER CORMIER

VERSUS

STATE OF LA., DEPT. OF WILDLIFE AND FISHERIES

**********

APPEAL FROM THE
OFFICE OF WORKERS' COMPENSATION - # 2
PARISH OF RAPIDES, NO. 05-07727
JASON GERARD OURSO, WORKERS' COMPENSATION JUDGE

**********

## ULYSSES GENE THIBODEAUX
## CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, and Billy Howard Ezell, Judges.

**AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART, AND RENDERED.**

James Earl Calhoun
Assistant Attorney General
P. O. Box 1710
Alexandria, LA 71308-1710
Telephone: (318) 487-5944
COUNSEL FOR:
    Defendant/Appellee - State of Louisiana, Department of Wildlife and Fisheries

Maria Anna Losavio
Losavio Law Firm
1821 MacArthur Drive
Alexandria, LA 71315
Telephone: (318) 767-9033
COUNSEL FOR:
    Plaintiff/Appellant - Christopher Cormier

**THIBODEAUX, Chief Judge.**

Appellant, Christopher Cormier, was denied a change of neurosurgeon by Defendant-appellee, the State of Louisiana, after a work-related injury.

The workers' compensation judge granted the change of neurosurgeon, but denied the request for penalties and attorney fees on all issues except the late payment of one of the two medical bills. Both the employee and the employer filed appeals. Cormier seeks a reversal of each of the three denials of penalties and attorney fees, and the employer seeks a reversal of the change in neurosurgeons, and a reversal of the single award of penalties and attorney fees. For the reasons set forth below, we affirm in part, amend in part, and reverse in part the judgment of the Office of Workers' Compensation (OWC).

## I.

### ISSUES

We must decide:

(1)    whether the OWC erred in granting Cormier a change of neurosurgeon to Dr. Bartholomew;

(2)    whether the OWC erred in denying Cormier penalties and attorney fees for the employer's failure to authorize the change in neurosurgeon;

(3)    whether the OWC erred in denying Cormier penalties and attorney fees for the employer's late payment of the initial wage benefit beyond the mandatory waiting period;

(4)    whether the OWC erred in denying Cormier penalties and attorney fees for the employer's late payment of Dr. Gerald Leglue's bill for services; and,

(5)    whether the OWC erred in granting Cormier penalties and attorney fees for the employer's late payment of the bill for surgical implants.

## FACTS AND PROCEDURAL HISTORY

Cormier worked for the Louisiana Department of Wildlife and Fisheries as an enforcement officer for sixteen years. On September 29, 2004, he sustained a work-related neck injury while attempting to handcuff a wanted criminal after an intense car chase. There was a struggle, and Cormier severely aggravated and re-injured his neck, which was injured on the same job nine years prior. With regard to the old injury in 1995, he had been off of work for a few months but had returned to full duty, with only six month medical check-ups, until the new injury on September 29, 2004. Cormier worked in pain throughout the month of October until he could get an appointment with his neurologist, Dr. Hajmurad, on November 1, 2004. On that date, Dr. Hajmurad took Cormier off of work and subsequently referred him to Dr. Stephen Goldware, a neurosurgeon in Lafayette. Dr. Goldware began treating Cormier on January 11, 2005, and continued his off-work status.

On February 25, 2005, Dr. Goldware performed a multilevel cervical fusion at C5-6 and C6-7 with placement of bone graft material, plates, and screws. The surgery was performed at Lafayette Surgical Specialty Hospital on an outpatient basis, even though Cormier requested, and was approved for, inpatient services. Cormier was admitted to the hospital at 5:41 a.m. on February 25, 2005. Dr. Goldware performed the surgery and discharged Cormier at 4:20 a.m. on February 26, 2005, less than twenty four hours after his admission, and approximately sixteen hours after his surgery. Cormier was discharged without a brace for his neck and could not hold his head erect without using his hands, and without the assistance of his wife, as he was wheeled out of the surgical facility. When he questioned the

absence of a brace, he was told that there was a foam collar in his box that he could use. However, the lightweight foam collar did not offer any support.

On May 26, 2005, Cormier had x-rays taken on his way to see Dr. Goldware. He took his x-rays with him and gave them to Dr. Goldware's receptionist. Dr. Goldware did not go over the x-rays with Cormier as usual, but indicated that he had seen them in his office. The x-rays showed motion of the upper cervical spine. Dr. Goldware reported a solid fusion without mentioning the motion and ordered physical therapy for Cormier for June 2005. At this time, Cormier had complaints of a heavy head, severe neck pain, and numbness in his left arm and fingers. Cormier requested an assignment to a physical therapy center within ten miles of his home in Cheneyville. However, Dr. Goldware required Cormier to travel two hours round-trip three times per week to the facility of Dr. Goldware's friend in Lafayette for the therapy. After each session, Cormier returned home in more pain. He required daily naps and could not sleep in a bed.

On Cormier's July 7, 2005 visit to Dr. Goldware, he was still unable to hold his head fully upright. Dr. Goldware rushed him through, announcing that he was fine after a "squeeze my finger" test, and left the room saying he had to look at the x-rays. Cormier's wife of twenty-seven years, who accompanied him to the visits with Dr. Goldware, informed the doctor that no x-rays were taken that day. The only x-rays were those taken in May before the physical therapy was ordered. When Dr. Goldware returned, he reported that there was no fusion. At this July 2005 visit, Dr. Goldware prescribed a hard neck collar for three months in order to immobilize the cervical spine. He told Cormier to go to his therapy session the next day, but when he arrived wearing the collar, the stunned therapists refused physical therapy.

3

On September 29, 2005, Cormier made written demand to the risk manager for treatment by Cormier's choice of physical medicine specialist, Dr. Gerald Leglue, in Alexandria. Treatment by Dr. Leglue was approved a few days later in early October.

Cormier's x-rays done on October 11, 2005, revealed an obvious lucency around the bone graft at C6-7 indicating a non-fusion, as opined by Dr. Bradley Bartholomew, who began treating Cormier in mid-December 2005.

Dr. Leglue was treating Cormier at the time of the October x-rays and was also concerned about non-fusion. On October 25, 2005, Dr. Leglue had his office fax directly to the risk manager a recommendation and request for evaluation by another neurosurgeon. Dr. Leglue named Dr. Anil Nanda in Shreveport as his recommendation. However, Dr. Leglue did not discuss Dr. Nanda with Cormier beforehand. Dr. Leglue's assistant, Denise Dupont, learned that Cormier wanted to request either a Dr. Willis or Dr. Bradley Bartholomew of New Orleans as his choice of neurosurgeon. Once aware of Cormier's choices, Denise Dupont called the adjuster on the claim, Kayla Crow, and related this information to her. However, Crow refused to approve any neurosurgeon other than Dr. Nanda.

On October 18, 2005, Dr. Goldware reported that there was a solid fusion at C5-6 and C6-7 and certified Cormier fit to return to duty, with restrictions, as an enforcement officer with Wildlife and Fisheries.

During September and October 2005, Cormier's attorney spoke with and wrote to the risk manager regarding Cormier's discomfort with Dr. Goldware, due to the early discharge after the surgery, the failed fusion, Dr. Goldware's ownership interest in the hospital where he performed the fusion on an outpatient basis, and his insistence on the physical therapy facility of a friend in Lafayette instead of the one

4

within ten miles of Cormier's home. Requests were made for a change in neurosurgeon according to Cormier's choice, but to no avail.

On October 31, 2005, Cormier's attorney made written demand for a change in neurosurgeon from Dr. Goldware to Dr. Bradley J. Bartholomew, as Cormier's choice of neurosurgeon, outlining the above reasons for the change.

On November 2, 2005, the risk manager, Kayla Crow, wrote Cormier's attorney a brief response, stating that she would "not allow a change in Mr. Cormier's choice of neurosurgeon."

On November 10, 2005, Cormier, through his attorney, filed his Disputed Claim for Compensation with the Office of Workers' Compensation for the employer's failure to authorize medical treatment, including but not limited to the change of neurosurgeon to Dr. Bradley Bartholomew.

On November 29, 2005, Cormier saw Dr. Goldware for the last time, as Dr. Goldware discharged him at that time stating that he could do nothing more for him. However, Dr. Goldware took Cormier permanently off work, finding him disabled for work as an enforcement officer, and he recommended that Cormier take disability retirement at that time. Cormier was forty-three (43) years old.

On December 13, 2005, Cormier used his own medical insurance to see the New Orleans neurosurgeon, Dr. Bradley Bartholomew. Dr. Bartholomew examined Cormier and found the non-fusion on the October 11, 2005 x-rays. He also noted the discrepancy in Dr. Goldware's July report showing a non-fusion, and Dr. Goldware's October report showing a solid fusion. Dr. Bartholomew further reported a range of motion in Cormier's neck of only 80% of normal with lateral rotation, only 60% with lateral rotation to the left, and only 40% on flexion/extension. Cormier also had decreased sensory in the left upper extremity in all fingers, a positive Tinel's of

5

the right ulnar nerve at the wrist, and a positive Tinel's at the left elbow. Dr. Bartholomew recommended a muscle stimulator, a bone stimulator, and Os-Cal Plus D.

Dr. Bartholomew requested EMG's and nerve conduction studies for ulnar neuropathy with regard to the wrist and the elbow. He also requested a CT scan for a base-line evaluation of the fusion, with a follow-up evaluation after three months of the newly-prescribed treatment. If the fusion had not taken by then, he opined that Cormier might have to undergo a revision of the fusion. Dr. Bartholomew opined that Cormier could return to sedentary duties but could not drive for more than an hour each way, which Cormier indicated would be required if he returned to Wildlife and Fisheries.

On March 24, 2006, Cormier's CT scan showed a non-union at the C5-6 and C6-7 levels. Dr. Bartholomew's progress notes of April 25, 2006 indicate his medical plan for a revision of the fusion at both levels, which Cormier declined on that date with the understanding that he should return when ready to consider the surgery.

On July 27, 2006, Cormier's attorney again requested in writing an approval of Dr. Bartholomew as Cormier's choice of neurosurgeon. She alleged that Dr. Goldware performed the surgery at the Lafayette Surgical Specialty Hospital on an outpatient basis for financial gain, because the outpatient reimbursement schedule allowed a much higher reimbursement than the per diem payment for inpatient surgeries. She attached proof of Dr. Goldware's ownership interest in the hospital, medical records showing Cormier's surgery admittance at 5:41 a.m. on February 25, 2005, and discharge at 4:20 a.m on the following morning. She also attached the surgery bill showing a reimbursement of $8,157.00 for the outpatient surgery and a

6

copy of the hospital reimbursement schedule showing a surgical per diem of only $1,655 for inpatient surgery in Lafayette hospitals, while the outpatient reimbursement was 90% of the covered charges. The approval for treatment by Dr. Bartholomew was never granted, and the attendant costs for the tests and treatments were never reimbursed, in spite of numerous demands.

The issues before the Office of Workers' Compensation (OWC) included the employer's failure to approve a change of neurosurgeon and Cormier's entitlement to penalties and attorney fees for the refusal to approve the change; Cormier's claim for penalties and attorney fees for the late payment of the first wage benefit, which was not paid for over three months after Cormier was taken off work; and, Cormier's claim for penalties and attorney fees for the late payment of two medical bills which, under workers' compensation law, should be paid within sixty days of submission.

III.

## LAW AND DISCUSSION

### Standard of Review

The supreme court has discussed the standard of review in workers' compensation cases as follows:

> In worker's compensation cases, the appropriate standard of review to be applied by the appellate court to the OWC's findings of fact is the "manifest error-clearly wrong" standard. *Brown v. Coastal Construction & Engineering*, Inc., 96-2705 (La.App. 1 Cir. 11/7/97), 704 So.2d 8, 10, (citing *Alexander v. Pellerin Marble & Granite*, 93-1698, pp. 5-6 (La. 1/14/94), 630 So.2d 706, 710). Accordingly, the findings of the OWC will not be set aside by a reviewing court unless they are found to be clearly wrong in light of the record viewed in its entirety. *Alexander*, 630 So.2d at 710.

7

*Angelle Concrete, Inc. v. Sandifer*, 06-38, p. 2 (La.App. 3 Cir. 5/24/06), 930 So.2d 1200, 1201-02, (La.App. 3 Cir. 2006), *citing, Dean v. Southmark Const.*, 03-1051, p. 7 (La. 7/6/04), 879 So.2d 112, 117.

### Change of Neurosurgeon, Penalties, and Attorney Fees

The State argues that the OWC was correct in denying penalties and attorney fees for the employer's refusal to authorize the change because the State was not arbitrary and capricious in withholding its consent to treatment by Dr. Bartholomew. The State concludes its brief argument by citing *Roszell v. Skip Converse Interior Co., Inc.,* 94-825 (La.App. 3 Cir. 2/1/95), 649 So.2d 1161, *writ denied,* 95-583 (La. 4/21/95), 653 So.2d 573, for the proposition that an employer is not liable for the fees of a physician who was the second treating physician within one field or specialty where the claimant failed to obtain prior consent from the employer. However, in *Roszell*, there apparently was no attempt to obtain approval from the employer for the second physician. More specifically, in *Roszell*, a panel of this court stated as follows:

> Roszell was examined by two orthopaedic surgeons of his choice. LSA-R.S. 23:1121(B) provides that an employee has the right to select one treating physician in any field or specialty. However, prior consent must be obtained from the employer or the worker's compensation carrier for a change of treating physician within within [sic] that same field or specialty. LSA-R.S. 23:1121(B). Roszell did not seek Interior's approval for an exam by Dr. Brunet. Therefore, Interior is not liable for Dr. Brunet's fees.

*Id*. at 1165.

Conversely, in the present case, Cormier sought the employer's approval for a change in neurosurgeon on numerous occasions by verbal requests and by written demands in September and October of 2005 before seeing Dr. Bartholomew in December 2005. Cormier's attorney articulated in writing the specific reasons for

the change from Dr. Goldware, citing the early discharge, the failed fusion, the failure to report the failed fusion evident in the May 2005 x-rays until July, and the order for aggressive physical therapy in June 2005. She further cited the diagnosis of a successful fusion in October 2005, and the concerns that the early discharge after surgery was motivated by the larger reimbursement for outpatient surgery at a facility in which Dr. Goldware had investment and/or ownership interests.

Accordingly, Cormier argues that the OWC properly found that he had shown valid grounds for the change in neurosurgeon, had properly ordered the change to Dr. Bartholomew, and properly ordered the bills of Dr. Bartholomew to be paid by the employer. However, Cormier argued that the OWC erred in denying him penalties and attorney fees for the State's failure to authorize the change in neurosurgeon and its failure to pay the bills of Dr. Bartholomew. At the end of the hearing on this matter, the OWC judge stated that an award of penalties and attorney fees on this issue was a "close call" for the court to make. He then concluded, without specifying the basis for his conclusion, that the State had reasonably controverted Cormier's claims for penalties and attorney fees. We disagree, and we reverse the OWC on the issue of penalties and attorney fees on the issue of Dr. Bartholomew and his bills and associated expenses.

As of the August 15, 2003 revisions, La.R.S. 23:1201 provides in pertinent part as follows:

> § 1201. Time and place of payment; failure to pay timely; failure to authorize; penalties and attorney fees
>
> . . . .
>
> E. Medical benefits payable under this Chapter shall be paid within sixty days after the employer or insurer receives written notice thereof.

9

F. Failure to provide payment in accordance with this Section or failure to consent to the employee's request to select a treating physician or change physicians when such consent is required by R.S. 23:1121 shall result in the assessment of a penalty in an amount up to the greater of twelve percent of any unpaid compensation or medical benefits, or fifty dollars per calendar day for each day in which any and all compensation or medical benefits remain unpaid or such consent is withheld, together with reasonable attorney fees for each disputed claim; however, the fifty dollars per calendar day penalty shall not exceed a maximum of two thousand dollars in the aggregate for any claim. The maximum amount of penalties which may be imposed at a hearing on the merits regardless of the number of penalties which might be imposed under this Section is eight thousand dollars. An award of penalties and attorney fees at any hearing on the merits shall be res judicata as to any and all claims for which penalties may be imposed under this Section which precedes the date of the hearing. Penalties shall be assessed in the following manner:

. . . .

(2) This Subsection shall not apply if the claim is reasonably controverted or if such nonpayment results from conditions over which the employer or insurer had no control.

. . . .

I. Any employer or insurer who at any time discontinues payment of claims due and arising under this Chapter, when such discontinuance is found to be arbitrary, capricious, or without probable cause, shall be subject to the payment of a penalty not to exceed eight thousand dollars and a reasonable attorney fee for the prosecution and collection of such claims. The provisions as set forth in R.S. 23:1141 limiting the amount of attorney fees shall not apply to cases where the employer or insurer is found liable for attorney fees under this Section. The provisions as set forth in R.S. 22:658(C) shall be applicable to claims arising under this Chapter.

J. Notwithstanding the fact that more than one violation in this Section which provides for an award of attorney fees may be applicable, only one reasonable attorney fee may be awarded against the employer or insurer in connection with any hearing on the merits of any disputed claim filed pursuant to this Section, and an award of such single

attorney fee shall be res judicata as to any and all conduct for which penalties may be imposed under this Section which precedes the date of the hearing.

Cormier argues that the State's refusal to authorize the change in neurosurgeon constitutes a *discontinuance* of medical benefits and is subject to penalties of up to $8,000.00 under La.R.S. 23:1201(I). We disagree as none of the cases cited by Cormier support that position, and we note that a change of physician is specifically addressed in La.R.S. 23:1201(F), not (I). In *Mullins v. Concrete & Steel Erectors*, 06-510 (La.App. 3 Cir. 9/27/06), 940 So.2d 803, *writ denied,* 06-2588 (La. 12/15/06), 945 So.2d 698, the application of La.R.S. 23:1201(I) was for the actual *discontinuance* of medical payments to a physician who had previously been receiving such payments, which is not the case here. We also note that Cormier tries to apply R.S. 23:1201(I) but states that he does not have to show arbitrary and capricious behavior on the part of defendant, which *is* a requirement of 23:1201(I). Cormier confuses the old law and the new law on penalties and attorney fees and on the burden of proof for the various penalties.

More specifically, revisions to the statutes effective on August 15, 2003, added R.S. 23:1201(I) and (J), and revised R.S. 23:1201(F) by adding a penalty of up to $2,000.00 for the failure to approve a change of physician, and by adding an $8,000.00 cap on multiple penalties emanating from the same hearing on the merits. Prior to August 2003, the discontinuance of payments and its penalties, now addressed in 23:1201(I), had previously been located at R.S. 23:1201.2, now repealed, and provided only for attorney fees, not penalties. The failure to approve a change of physician, now addressed in R.S. 23:1201(F) was located at R.S. 23:1121(C), now repealed, and provided that a refusal found to be arbitrary and capricious or without probable cause, renders the employer/insurer liable for attorney

11

fees, but not penalties. None of the cases cited by Cormier, under the new law or the old law, characterize a refusal to approve a change of physician as a *discontinuance* of benefits.

Cormier's accident occurred on September 29, 2005,[1] and the applicable statute addressing the refusal to approve a change of physician is now, and as of August 2003, R.S. 23:1201(F) and 23:1201(F)(2), as shown in full text above. Therefore, Cormier's request for a change of neurosurgeon should have been granted, and his bills paid, unless the employer reasonably controverted the claim, or the non-payment was beyond the employer's control. In this case, if Cormier's claim was not reasonably controverted by the State, Cormier is entitled to attorney fees and a penalty of up to $2,000.00 for this refusal. To reasonably controvert a workers' compensation claim so as to avoid the imposition of penalties and attorney fees, the employer and its insurer must provide sufficient factual and medical information to reasonably counter the evidence provided by the claimant. La.R.S. 23:1201(F); *Baca v. Natchitoches Parish Hosp.,* 06-1132 (La.App. 3 Cir. 2/7/07), 948 So.2d 1205; *Brown v. Guide Corp.,* 42,141 (La.App. 2 Cir. 5/9/07), 956 So.2d 808. The employer must have an "articulable and objective reason to deny benefits at the time it took the action." *Baca*, 948 So.2d at 1212.

In the present case, Cormier made verbal and written requests for a change of neurosurgeon at least in, and probably before, September and October of 2005, and a specific written demand for a change to Dr. Bartholomew on October 31. He provided details regarding the early discharge by Dr. Goldware, the x-rays

---

[1]Cormier suffered a neck injury with the same employer in the mid 1990's but recovered and returned to full duties for nine years. While an allegation of an aggravation of the old injury was included in Cormier's claim, the new injury and current physicians and their treatment are the only issues raised. The jurisprudence is clear that "the provisions of the statute in effect at the time of the withholding of benefits control the award of penalties and attorney fees." *Lambert v. Brookshire Grocery Co.*, 06-1001 (La.App. 3 Cir. 12/20/06), 945 So.2d 918, 932. Therefore the applicable law is the new law effective on August 15, 2003.

showing a non-fusion in May and Dr. Goldware's order for aggressive physical therapy in June. Moreover, Dr. Leglue made a written recommendation for an evaluation by another neurosurgeon on October 25, 2005, due to his concerns about the integrity of fusion. Denise Dupont in Dr. Leglue's office, upon learning of Cormier's wishes, called Kayla Crow explaining the request for Dr. Willis or Dr. Bartholomew. Crow's response was that she would only approve Dr. Nanda.

In Kayla Crow's written response on November 2, 2005, she did not provide an articulable and objective reason to deny the change to Dr. Bartholomew. Rather, she wrote a very brief response as follows:

> Although I am not convinced it is necessary, as recommended by Dr. Leglue, I was willing to allow Sergeant Cormier to see Dr. Anil Nanda. Further, I was willing to utilize Dr. Nanda as my choice. Sergeant Cormier should address your speculations regarding Dr. Goldware's financial considerations with Dr. Goldware. I will not allow a change in Sergeant Cormier's choice of neurosurgeon.

Crow did not provide reasons for her denial as to Dr. Bartholomew, and she never attempted to obtain a second opinion from Dr. Nanda. Dr. Goldware's history with Cormier up to this point had filled with red flags as articulated above. The State provides no argument on this issue in its appellate brief, and the only argument made at trial was the defendant's mention of a radiologist report in October 2005 of a successful fusion, where Dr. Bartholomew looked at the film and saw a non-fusion.

At trial Cormier's attorney introduced the report of radiologist Mark Stephan stating that the May 26, 2005 films of the cervical spine showed "physiologic motion at the upper cervical spine." Her examination of Kayla Crow on this issue elicited the following testimony:

13

Q. You agree, Ms. Crow, that the x-ray of the neck taken on May 26, 2005, does show motion of the cervical spine, which is indicative of a non-fusion? You and I talked about this in May of 2005; is that right?

A. I'm not sure. I'd have to look at it, the report.

Q. Sure. Physiological motion is seen –

A. Yes.

Q. You remember that now?

A. Yes.

Q. So you agree that the may 26, 2005 x-ray, Exhibit No. 60, shows motion, which is indicative of a non-fusion of the cervical spine?

A. It shows motion, I don't know what that's indicative of.

Q. You didn't call Dr. Goldware and ask him in conversations you had with him?

A. No.

Q. Do you have any idea what Dr. Goldware was relying on, on May 26, 2005 when his office note says, "He reviewed x-rays and the fusion is healed"?

A. No.

Q. Do you have any idea what he's relying on, on the next visit of July 7, 2005 when he now says, "it's not healed"?

A. No.

Q. Did that concern you?

A. No.

Q. As a patient you wouldn't want to know if your cervical fusion is healed or not healed?

A. If I was a cervical patient, I assume I would.

Q. You'd want to know, wouldn't you?

14

A.  Yes.

Q.  You'd want to know which one, am I healed, or I'm not healed.  Is it fused or not fused, right?  You'd want to know?  It is your spine, you are worried about your spine, right?

A.  Correct.  It may can change, I don't know.

Q.  You don't know that.  You don't known if it can change or not, you're not a medical doctor are you?

A.  No, I'm not.

As stated, on November 29, 2005, after Crow's written refusal to allow treatment by Dr. Bartholomew, Dr. Goldware discharged Cormier, again reported the fusion healed, but declared him disabled and recommended disability retirement at that time.

After treating with Dr. Bartholomew between December 2005 and April 2006 and confirming the non-fusion, the recommendation for a revision of the fusion and the ulnar nerve problems, Cormier again made written demand in July of 2006 for an authorized change to Dr. Bartholomew, and for payments of his medical bills, treatment, prescriptions and all tests, including the CT scan and EMG studies.  Even though he had no other neurosurgeon and he was discharged and disabled eight months prior by Goldware, and without benefit of another medical opinion to refute Dr. Bartholomew's findings, the employer refused to authorize treatment by Dr. Bartholomew.

The record before us does not indicate that the employer in this case provided sufficient factual and medical information to reasonably counter the evidence provided by the claimant, particularly in the summer of 2006.  Accordingly, we reverse the OWC judgment on this issue and award the maximum penalty of $2,000.00 for the employer's refusal to approve the treatment and pay the medical

15

bills of Dr. Bartholomew. Mr. Cormier is also entitled to attorney fees for this violation, and we will include the work done on these issues when we have analyzed all violations, pursuant to 23:1201(J) indicating that only one attorney fee can be awarded for multiple violations emanating from a hearing on the merits on a disputed claim.

### Late Payment of Initial Wage Benefit

Cormier contends that the OWC erred in denying his request for penalties and attorney fees for the employer's late payment of the first week's wage benefit for temporary total disability (TTD), which was paid in this case thirteen weeks after Cormier was taken off work, rather than by the sixth week as mandated by statute. The OWC judge denied Cormier's request for penalties and attorney fees on this issue, stating that Cormier had received full pay from the beginning because he used the State's buy-back program. He, therefore, was not harmed or prejudiced by the late payment.

More specifically, La.R.S. 23:1224, entitled "Payments not recoverable for first week; exceptions," states that, "No compensation shall be paid for the first week after the injury is received; provided, that in cases where disability from injury continues for six weeks or longer after date of the accident, compensation for the first week shall be paid after the first six weeks have elapsed." La.R.S. 23:1224. In this case, Cormier was injured on September 29, 2004, and the TTD benefit at issue, in the amount of $438.00, was not issued until January 31, 2005, and was not received by Cormier until February 2005. However, Cormier had continued to go to work after his injury and was not taken off work by a physician until he was able to get an appointment with Dr. Hajmurad on November 1, 2004.

On November 1, 2004, Dr. Hajmurad examined Cormier, wrote a report taking him off work, and carbon copied the workers' compensation carrier. He also wrote an off-work slip for Cormier on November 1, 2004. Therefore, Cormier argues that the date of November 1st governs the timeliness issue herein and that the initial benefit check, covering the period of November 1 through November 7, 2004, was due at the end of the sixth week, which made it due on December 12, 2004. Accordingly, he alleges that the check, issued on January 31, 2004, was seven weeks late. At trial, Kayla Crow testified that she did not become the adjuster on the case until November and did not get the medical records for about twenty-five days. However, Dr. Hajmurad's records indicate that his office was in touch with an adjuster named Sue on October 21, 2004, who was denying testing until after the doctor's evaluation. Moreover, Cormier reported his injury to his supervisor the day it happened and filed a written report with risk management the following day on September 30, 2004. For some unknown reason, the State did not fill out its 1007 Injury Report until October 19, 2004. Notwithstanding, because of his previous neck injury nine years prior and his continuing six-month follow-ups with Dr. Hajmurad, the State was well aware of the injuries and potential disabilities in this case. Therefore, we will consider the employer informed of the need for TTD benefits as of November 1, 2004 when Dr. Hajmurad took Cormier off work.

Under La.R.S. 23:1201(A), wage benefits must be paid as near as possible at the same time and place that they were paid prior to the injury. Under Subsection 1201(B), the first installment for the TTD benefit is due "on the fourteenth day after the employer or insurer has knowledge of the injury or death, on which date all such compensation then due shall be paid." La.R.S. 23:1201(B). The claimant is entitled to a penalty of up to $2,000.00, plus attorney fees, under La.R.S. 23:1201(F)

17

for "[f]ailure to provide payment in accordance with this Section." While the due date of the initial first-week benefit is addressed in La.R.S. 23:1224, which is a different Section of Title 23, the Louisiana Supreme Court has applied Section 1201(F) penalties and attorney fees to a Section 1224 violation, when the initial TTD benefit was only three weeks late.

In *Brown v. Texas-LA Cartage, Inc.,* 98-1063 (La. 12/1/98), 721 So.2d 885, 891, the court analyzed similar facts and applied the law as follows:

> Given the correct interpretation of that portion of La.R.S. 23:1201 at issue in this case, we now turn to the application of this statute to the facts at hand. Claimant alleges he is owed penalties and attorney fees under La.R.S. 23:1201(F) because the first installment of his benefits was late, partial in that it was not a remittance of "all such compensation then due" and in the incorrect amount and because the first week of benefits, withheld pursuant to La.R.S. 23:1224, was not timely paid. We agree.
>
> The record is unclear as to when Brown's employer received notice of his temporary total disability. Brown received an off-work slip from his doctor on July 9 and his employer faxed the slip to the insurer on July 10. There is no evidence, however, to show whether his employer received the slip on the ninth or the tenth. If his employer received it on the ninth, then the first installment was due on July 23 rather than on July 24, the date his check was issued by the insurer. We need not belabor this point, however, because it is clear the provisions of La.R.S. 23:1201 were violated by the insurer's partial payment of compensation benefits due. Louisiana R.S. 23:1201(B) provides that the first installment of compensation payable for temporary total disability shall become due on the fourteenth day after the employer or insurer has knowledge of the injury, on which date all such compensation then due shall be paid. The first week of benefits, those for July 9 through July 15, was validly withheld pursuant to La.R.S.23:1224. Thus, on July 24, all compensation then due should have been remitted to Brown. On July 24, however, the insurer issued a check for the period of July 16 through July 20 because of its internal policy of only issuing checks on Wednesday and then for the previous period ending on Saturday. As such, the clear mandate of La.R.S. 23:1201(B) was violated, thereby triggering an

18

award of penalties under La.R.S. 23:1201(F) unless one of the two exceptions applied. Furthermore, even that partial payment was paid in an incorrect amount, as Brown's average weekly wage was incorrectly calculated under La.R.S. 23:1021(10)(a)(iii) instead of under La.R.S. 23:1021(10)(a)(i). Finally, the first week of withheld benefits, due "after the first six weeks have elapsed" pursuant to La.R.S. 23:1224, was not paid until September 10 even though the six week period ended on August 20.

As discussed above, penalties should be assessed against defendants unless the employer or insurer reasonably controverted Brown's right to the benefits or the violations resulted from conditions over which the employer or insurer had no control. Defendants do not claim, nor do the facts support the argument that the benefits were not timely paid for reasons beyond the employer's or insurer's control. Therefore, we must determine whether the employee's right to the timely and accurate payment of benefits was reasonably controverted by the employer or the insurer. We find that it was not.

*Brown v. Texas-LA Cartage, Inc.,* 721 So.2d at 891.

The *Brown* court further analyzed the specifics of that case and found in favor of the claimant regarding all violations, stating that, as to the initial TTD benefit, the delay of three weeks following the expiration of the six-week period was unreasonable. The court concluded as follows:

[A]n unreasonable action cannot amount to a reasonable controversion. For all of these reasons, we conclude plaintiff is entitled to an award of penalties and attorney fees and we remand the case to the trial court for the taking of evidence on this issue.

We are cognizant of the fact that defendants did not act in an egregious manner in this case. However, the purpose of an imposition of penalties is to "nudge the employer into making timely payments when there is no reasonable basis for refusing or delaying its obligation." *Weber v. State,* 93-0062, p. 8 (La. 4/11/94), 635 So.2d 188, 193. An imposition of penalties in this case furthers such a policy by ensuring that employers and insurers are in compliance with the statutory scheme that requires timely payments unless the employer or insurer has a valid reason or evidence upon which to base a denial of benefits.

*Id.* at 893 (footnotes omitted).

Accordingly, under *Brown*, Cormier is entitled to penalties and attorney fees for the initial payment which was held seven weeks beyond the six-week waiting period. Additionally, in the present case, we note that Cormier's TTD benefits, excluding the initial one which is supposed to be held for six weeks, did not begin on November 14, 2004, as required under La.R.S. 23:1201(B). He was not issued TTD benefit checks until December 8, 2004, and at that time he was issued a check for five weeks of benefits, covering the period of November 8 through December 5, 2004.

At trial, Kayla Crow admitted that, at the time she began paying TTD benefits on December 8, 2004, the payment for the waiting period week, November 1 through November 7, was due the next week [December 12], but she gave no reason as to why she held the first-week waiting period check until January 31, 2005. Nor did she give reasons for the delay in beginning regular TTD benefits until December 8th, when Section 1201(B) required them to begin on November 14th. However, while this issue was discussed at length at trial, Cormier has not presented argument as to a Section 1201(B) violation. The only violation alleged with regard to the TTD payments was the tardy Section 1224 initial payment.

Even though the Section 1224 initial check was clearly, undisputably, and uncontrovertedly seven weeks late, the OWC judge denied the penalties and attorney fees because Cormier was receiving his sick leave under the State's "buy-back" program. The judge stated that Cormier received full pay, his checks "never missed a beat," then the internal pay back process began, with no prejudice or harm to Cormier.

In its brief, the State cited Civil Service Rule 11.21 which provides that a disabled employee can draw accrued sick leave pay in an amount sufficient to bring

20

his compensation payments up to his regular salary amount. However, we could find no evidence of the dates when Cormier began receiving money from the buy-back program. It was stipulated at trial that Cormier's average *weekly* wage was $987.60 prior to injury, and that his maximum workers' compensation rate was $438.00 *per week*. The first TTD benefit issued to him on December 8, 2004, was for $1,752.00, but it covered *four weeks* of benefits at $438.00, from November 8, until December 5, 2004. All remaining TTD benefits were paid at *two-week* intervals, or about every thirteen days, according to the State's printout, in the amount of $876.00 each, which is $438.00 *per week*. The printouts address only the TTD benefits paid and only amount to $438.00 *per week*.

There simply is no evidence of the pay-back supplements in the record. It appears that the OWC judge may have looked at the printout of payments, thought the $876.00 payments were weekly benefits rather than bi-weekly benefits. Since the $876.00 for *two weeks* of benefits is visibly similar to the $987.60 average *weekly* wage that Cormier was receiving before the injury, the OWC may have confused the two. This would account for his statement that Cormier was receiving full pay all along. At some point the buy-back supplements did kick in and brought Cormier to full salary, but there is no evidence of when that was. However, we do know from the printout that both the regular TTD payments and the initial TTD benefit were paid weeks after they were due.

At trial, the State argued that this rule regarding the buy-back program was there to "satisfy" the late payment issue pursuant to *Wall v. Avoyelles Correctional Center*, 05-781 (La.App. 3 Cir. 2/01/06), 921 So.2d 1173, *writ denied,* 06-510 (La. 5/5/06), 927So.2d 322. We believe this is a gross misrepresentation. In

21

its brief, the State merely claimed that *Wall* held that payments in accordance with the civil service rules are "proper."

In *Wall*, a panel of this court referred to Civil Service Rule 15.2.1 which provided for the establishment of specific payroll periods, bi-weekly, monthly, etc., and mandated that paychecks must be issued no later than seven calendar days following the end of the applicable payroll period unless otherwise approved by the Director. We then cited La.R.S. 23:1201(A) which provides that compensation payments shall be made as near as possible to the time as wages were payable to the employee before the accident. Finding that the employee in *Wall* continued to be paid bi-weekly as before the injury, and even received his checks earlier than before the injury, we denied penalties and attorney fees. The case alludes to printouts and calendars used to arrive at the decision to deny penalties, but no dates were provided in the opinion. Moreover, the allegation of untimely benefit payments was general, and no specific payment date was discussed. *Wall* does not concern the State's buy-back program, or Civil Service Rule 11.21, and is not analogous to this case.

Cormier argues that the OWC erred in basing his denial of penalties and attorney fees on the fact that Cormier had not shown harm or prejudice caused him by the late payment of the initial benefit. We agree. In *Perron v. Landry Parish Economic Industrial Development Dist.,* 03-1061 (La.App. 3 Cir. 3/3/04), 867 So.2d 86, 90, *writ denied,* 04-1502 (La. 10/01/04), 883 So.2d 1009, we specifically stated that "La.R.S. 23:1201 does not contain a provision requiring prejudice or actual loss to the employee."

In *Daugherty v. Domino's Pizza*, 95-1394 (La. 5/21/96), 674 So.2d 947, the Louisiana Supreme Court held that where the fact of a late payment is uncontradicted, and the employer fails to reasonably controvert the payment or show

22

that it resulted from conditions over which the employer had no control, La.R.S. 23:1201 mandates an award of penalties and attorney's fees. Therefore, under *Brown* and *Daugherty*, as well as *Perron* and *Wall*, we find that the OWC erred in refusing to award penalties and attorney fees for the initial TTD benefit that was paid seven weeks late. Accordingly, we award a penalty of $2,000.00 for the late payment. We will also award attorney fees on this issue when all remaining issues are examined.

**Penalties and Attorney Fees for Late Payment of Dr. Leglue's Bill**

Cormier contends that the OWC erred in denying his request for penalties and attorney fees for the employer's late payment of Dr. Leglue's bill for services on October 25, 2005 in the amount of $86.00. The bill is on the proper HCFA form and is stamped received by risk management on November 8, 2005. Kayla Crow testified that she sent the bill to Corvel Corporation for review and payment, and the bill shows a receipt stamp by Corvel dated November 29, 2005. The bill was not paid until April 6, 2006, five months after risk management received the bill, embarrassingly far beyond the sixty-day period allowed by La.R.S. 23:1201(E). Crow testified that her understanding was that Corvel picked up the date of service as 10/25/01 instead of 10/25/05 and that they denied payment because the bill predated the injury.

Crow further stated that the billing information was misaligned on the form by Dr. Leglue's office, and when scanned by Corvel's equipment, the year was picked up as 2001 instead of 2005. Cormier's attorney objected to Crow's testimony regarding Corvel's practices as hearsay, since Crow did not work for Corvel and had no first hand knowledge of what occurred. She re-urged her objection on appeal by assigning as error the OWC's allowance of the testimony. However, under the

present circumstances, we do not reach the issue of hearsay, because we can review the bill itself, as well as other documentation by Corvel.

The bill itself contains the date of 10/25/05 four times, twice in columns where the type is misaligned with the columns, and twice in large blocks that have no columns and where the type is very clear and the date very prominent. In the columns where the type is misaligned, the date appears as 1/02/50 in one and 51/02/5 in the other. Nowhere does it appear as 10/25/01. Moreover, the amount of the bill is misaligned as well, and it appears not as $86.00, but rather as $8.60. Yet, in other documentation by Corvel, they show the date incorrectly as 10/25/01, but show the correct amount of $86.00. The amount of $86.00 appears on the HCFA bill three times, and in every instance, the "8" is the only figure that appears in the "dollar" column, while the "6.0" appears in the "cents" column.

Corvel's apparent reading of the bill is highly suspect and constitutes a clerical error on Corvel's part, not to be blamed on Dr. Leglue's form which contained all of the correct information. Moreover, the actions of Corvel, as an agent of the State, are imputed to the State. The employer cannot "cordon itself with a rampart of agents and be protected from their slipshod practices." *LaHaye v. Westmoreland Cas. Co.*, 509 So.2d 748, 750 (La.App. 3 Cir. 5/13/87). Nor can an employer "urge its own poor clerical work to escape penalties and attorney fees for nonpayment." *Belaire v. Don Shetler Olds Buick Chevrolet,* 02-1152, p. 10 (La.App. 3 Cir. 6/4/03), 847 So.2d 723, 731, quoting *Fisher v. Lincoln Timber Co.*, 31,430, p. 15 (La.App. 2 Cir. 1/24/99), 730 So.2d 973, 982.

Accordingly, the OWC erred in finding that the clerical error was beyond the control of the employer. In fact, Kayla Crow finally looked at the bill and paid it out of her own office. We award $2,000.00 in penalties for the payment of Dr.

24

Leglue's bill approximately ninety days past the sixty-day deadline set forth in La.R.S. 23:1201(E). Again, we will award one attorney fee when all violations are considered.

### Penalties and Attorney Fees for Late Payment of Bill for Surgical Implants

The State contends that it was error for the OWC to award Cormier penalties in the amount of $2,000.00 and attorney fees in the amount of $3,500.00 for the State's late payment of the hospital's bill for surgical implants and instrumentation. The record reveals that the bone grafts, plates, and screws, placed in Cormier's cervical spine during his surgery on February 25, 2005, were billed at $6,502.00. The adjuster received the bills from Lafayette Surgical Specialty Hospital (LSSH) on March 28, 2005, and subsequently sent them to Corvel. Corvel stamped the bill for the surgery, and the attached invoices for the implants and instrumentation, as received on April 15, 2005. The bill was not paid until August 18, 2005. At trial, the State tried to elicit testimony from Kayla Crow that the documentation was confusing and deficient because of missing invoices. However, the invoices for the implants and instrumentation in the record contain the same stamp by Corvel as the hospital bill for the entire surgery, all showing a receipt date of April 15, 2005. Again, the State failed to have Corvel there to testify as to its reasons for delaying the payment. The total amount of these invoices for the bone graft material and instrumentation is $6,502.00, which is the exact amount finally paid on August 18, 2005.

The OWC judge stated at the end of trial that "the State and Corvel had adequate time to pay the claim, had adequate information to pay the claim for the hospital bill, particularly the implants and failed to pay it within the time frame

provided by law." We agree. Accordingly, we affirm the OWC's award of $2,000.00 for the late payment of the bill for the implanted bone, plates and screws. However, we find the award of attorney fees deficient. According to La.R.S. 23:1201(J), only one reasonable attorney fee may be awarded for all violations emanating from any hearing on the merits on any disputed claim for compensation.

In the present case, the State committed violations in four major areas. It (1) failed to authorize the change of neurosurgeon and refused to pay Dr. Bartholomew's bills for tests and treatment, including the stimulators prescribed, the entire time that Cormier was under Dr. Bartholomew's care; (2) paid the initial TTD benefit seven weeks late; (3) paid Dr. Leglue's bill three months late; and, (4) paid for the surgical implants and hardware approximately three months late as well. There were also problems with mileage reimbursements and other out of pocket expenses.

In addition to the normal duties of an attorney representation, including legal research, pleadings filed, depositions, numerous telephone conversations with physicians, lawyers, clients, witnesses, adjusters, and court personnel, numerous requests for medical treatment and payment for medical expenses, the record in this case contains at least twenty-eight demand letters drafted on behalf of Cormier between September 29, 2005 and November 2, 2006, prior to trial on November 13, 2006. Volumes of medical records have been collected, studied, and placed in the record. Furthermore, Cormier's attorney prepared for trial, and, as the workers' compensation judge noted, argued ably and performed superbly.

In *Lambert v. Brookshire Grocery Co.,* 06-1001 (La.App. 3 Cir. 12/20/06), 945 So.2d 918, 933, we stated that the reasonableness of an award of attorney's fees is determined from "the degree of skill and ability exercised, the

amount of the claim, the amount recovered for the plaintiff, and the amount of time devoted to the case." There, we affirmed an award of $12,000.00 for similar work and abilities in a workers' compensation case. In the present case, where the OWC awarded $3,500.00 for a single violation, we think an appropriate award for the four violations is four times that amount, or $14,000.00. This amount is particularly appropriate where the violations concerning Dr. Bartholomew occurred repeatedly every time a test was done, or services were rendered, or equipment ordered, for the entire time that Cormier was in the care of Dr. Bartholomew.

## Court Costs

In his oral ruling at the end of trial, the OWC judge ordered that all of Cormier's court costs and expenses, pursuant to the itemized list in Plaintiff's Exhibit No. 64, were to be paid by the defendant. That exhibit contains court costs in the total amount of $818.89. Ms. Losavio, Cormier's attorney, drafted a Judgment that included all of the specifics determined in the trial, including the stipulations and the specific amount of court costs of $818.89. However, when the parties could not agree on the language, the OWC judge signed the judgment submitted by the State. That judgment omitted the dollar amount of the court costs, $818.89. As pointed out by Cormier's attorney, La.R.S. 13:5112 provides that

> A. In any suit against the state or any department, board, commission, agency, or political subdivision thereof, the trial or appellate court, after taking into account any equitable considerations as it would under Article 1920 or Article 2164 of the Code of Civil Procedure, as applicable, may grant in favor of the successful party and against the state, department, board, commission, agency, or political subdivision against which judgment is rendered, an award of such successful party's court costs under R.S. 13:4533 and other applicable law as the court deems proper but, if awarded, shall express such costs in a dollar amount in a judgment of the trial court or decree of the appellate court.

27

Accordingly, we hereby grant the specific amount of $818.89 to Cormier for court costs in this matter.

IV.

**CONCLUSION**

Based upon the foregoing, we affirm the portion of the OWC judgment authorizing the change of neurosurgeon to Dr. Bartholomew, and the order to pay for all associated bills, tests, and expenses associated with his treatment of Cormier. We also affirm the OWC award of penalties in the amount of $2,000.00 for the State's late payment of the cost of the bone implants and instrumentation. However, we reverse the portions of the OWC judgment denying penalties and attorney fees for failure to authorize and pay for treatment by Dr. Bartholomew, for the late payment of the initial TTD benefit, and for the late payment of Dr. Leglue's bill, and we award a penalty of $2,000.00 for each of those three violations. Hence, we award a total of $8,000.00 in penalties for the four violations emanating from the hearing of Cormier's disputed claims on November 13, 2006.

Further, we amend the award of $3,500.00 for attorney fees on the issue of the late payment of the bill for implants, to a single award of $14,000.00 in attorney fees for work done on all violations at issue herein. Further, we amend the judgment of the OWC to include a specific award of court costs in the amount of $818.89, pursuant to La.R.S. 13:5112.

**AFFIRMED IN PART; AMENDED IN PART; REVERSED IN PART, AND RENDERED.**